### STATE *v.* YOUNG HARRIS.

There being evidence that the deceased came to his death by the infliction of whippings by the prisoner, whilst the latter insisted that the death was caused by a burn of which there was an appearance on the abdomen, the testimony of a physician that in his opinion the burn was inflicted *after death*, was admissible in support of other evidence for the prosecution.

The evidence being closed on both sides, upon the defendant being permitted to recall a witness to explain a part of his testimony, it is within the discretion of the Judge to forbid the examination of the witness as to new matter.

The prisoner and a woman offered as a witness in his behalf having lived together as husband and wife while they were slaves, and having subsequently observed the ceremonies required by the Act of 1866, ch. 40, s. 5: *Held* that they were legally married, and her testimony properly excluded.

Although the law allows to a person *in loco parentis* the broadest latitude in governing, it is not necessary to prove *express* malice on his part in order to convict of murder, if the facts show such cruelty and inhumanity in whipping as exclude the idea of passion.

It being a question whether a severe injury, supposed to be a burn, was received by the deceased before death, it was competent for the prisoner to show that the deceased *said* he had a large burn upon his abdomen; such declarations being admissible as *natural* evidence.

(*State* v. *Samuel*, 2 Dev. & Bat. 177; *Roulhac* v. *White*, 9 Ire., 63; *Biles* v. *Holmes*, 11 Ire., 16; *Lush* v. *McDaniel*, 13 Ire., 485; *Bell* v. *Morrisett*, 6 Jon., 178, and *Henderson* v. *Crouse*, 7 Jon., 623, cited and approved.)

MURDER, tried before *Mitchell*, J., at Spring Term 1868, of the Superior Court of ROWAN.

The prisoner, a colored man, was indicted together with one Jane Harris, who had lived with him as his wife while they were slaves and after emancipation had continued to live with him having complied with the requirements of the Act of 1866, ch. 40 ; but he was put upon trial alone. The deceased, a boy eighteen or nineteen years old, was the illegitimate son of Jane, and it was alleged that he came to his death in consequence of numerous and severe beatings upon his naked body, inflicted by the prisoner every day for a week, with a large leather strap, a bed cord twice doubled and knotted, and an iron ramrod—the alleged offence being that he had begged a piece of meat from a neighbor, and had denied doing so. At the end of the week he died.

The witness to the beating was a girl named Louisa Harris. Dr. Fraley was also examined as a witness for the State, having been previously called upon by the coroner to examine the body. His testimony tended to corroborate that of Louisa Harris—by showing that the back, loins and sides of the deceased were covered with bruises, &c. The theory of the defence was that the deceased came to his death by a burn, of which there was an appearance on his abdomen. Dr. Fraley testified that in his opinion this was caused by fire applied *after* the death. The prisoner introduced Dr. Jones and Dr. Whitehead, who testified that from the description of the burn given by Dr. Fraley, it had occurred *before* death. The prisoner offered Jane Harris as a witness, but the Court ruled her to be incompetent. He then introduced his son Wallace Harris, who testified that about a week before deceased died, he was burning a brush-heap, and on getting upon it the flames flashed as high as his waist, when he jumped off and ran to a branch near by; and that the deceased showed him a burn on his leg. The prisoner offered to prove by this witness that the deceased told him he was burned on the abdomen, but his Honor excluded the declaration.

After it was announced by both sides that the evidence was closed, the prisoner's counsel obtained leave to recall Dr. Jones, to explain part of his testimony. They then proposed

to examine him upon other points; but the Court refused to allow the examination to proceed further.

The charge of the Court and the. exceptions thereto are sufficiently set forth in the opinion of the Court.

Verdict, Guilty. Rule for a new trial discharged. Judgment, and Appeal.

*Attorney General*, for the State.

*Boyden & Bailey* and *J. E. Kerr*, *contra*.

READE, J. In considering the legal questions involved, we hope that we have not allowed ourselves to be unduly influenced by the cruel and inhuman acts detailed in the evidence.

1. In considering the first exception on the part of the defendant, it is to be recollected that the theory of the defence was that the deceased did not come to his death by the whippings, but in consequence of a severe burn on the abdomen.

Dr. Fraley was introduced by the State, and gave it as his opinion that the burn was received after death. This testimony was left to the jury by his Honor, as tending to corroborate the evidence of the girl, and the theory of the prosecution. We see no force in the exception to it by the prisoner.

The opinion of the Doctor as an expert, was clearly admissible, and, if his opinion was well founded, it proved the defendant's theory, that the deceased came to his death by the burn—to be false, and it tended to corroborate the testimony of the girl.

2. After the evidence was closed on both sides, the defendant's counsel asked leave to recall a witness to make an explanation of some point in his testimony. He was permitted to do so. After the explanation was made, the counsel attempted to extend the examination *to new matter*. This was refused by the Court, and the defendant excepted again.

It was clearly within his Honor's discretion whether he would allow the witness to be recalled, and it was as clearly

within his discretion to prescribe the terms, and to limit the examination.

It would be unjust to the counsel to suppose that there was any attempt to entrap the Court by proposing to recall the witness for a simple explanation, when the real purpose was to open the evidence anew; and so we take it that the only purpose in recalling the witness was, to explain. Therefore, as soon as the explanation was given it was legitimate for his Honor to stop the examination.

3. The defendant offered Jane Harris as a witness. The defendant and Jane while slaves, cohabited as man and wife. After their emancipation they observed the ceremonies prescribed by the statute of 1866, chap. 40, sec. 5. That statute provides that " the parties shall be deemed to have been lawfully married as man and wife at the time of the commencement of such cohabitation, although they may not have been married in due form of law."

The competency of Jane was objected to by the State. She was ruled out and again the defendant excepted.

Whether Jane was a competent witness, depends upon the question whether she was the defendant's wife; and this again depends upon the force of the above statute. Marriage is a civil contract. It is more than that: I at least the status which marriage creates is a divine, as well as a civil institution. But our Courts deal with it only as a civil contract. And therefore it is insisted that as slaves had no power to contract, the status of marriage did not exist among them. *State* v. *Samuel*, 2 Dev. & Bat. 177.

We have no purpose to controvert this position. It is true that during the existence of slavery our law did not provide for the solemnization of marriage among them. They were left in a state of nature. And being so, it might be interesting to enquire how far a former marriage *per verba de presenti* affected their relations after their condition had been changed from slavery to freedom. For, in a state of nature, where no solemnities of marriage are prescribed, a marriage *per verba de presenti* must be valid. But we are relieved from the neces-

sity of a consideration of that question, because of the whole-some statute which we have cited. The substance of mar-riage—the consent of the parties, existing, it was as clearly within the power of the Legislature to dispense with any particular formality, as it was to prescribe such.

This neither made nor impaired the contract, but gave effect to the parties' consent, and recognized as a legal relation that which the parties had constituted a natural one.

So that, by force of the original consent of the parties while they were slaves, renewed after they became free, and by the performance of what was required by the statute, they became to all intents and purposes man and wife. This would be so upon the *strictest* construction; much more then upon the liberal construction which should be given to a statute of great public necessity, affecting the domestic relations of one-third of our people, and the morals of society in general.

We conclude that Jane was the wife of the defendant, and I was properly excluded from testifying.

4. The defendant insisted that he was *in loco parentis* towards the deceased, and that in the absence of express malice, his crime would be manslaughter only.

His Honor charged otherwise, and the defendant excepted. Conceding, for the sake of the argument, that the defendant did stand in the place of parent to the deceased, still the exception cannot avail him. It is true that the law allows to parents the broadest latitude in governing, and to that end correcting, their children. But the acts detailed in this case, were so cruel and inhuman, and so often repeated, and long continued, as to manifest " a heart totally regardless of social duty and fatally bent on mischief." They totally exclude the idea of *passion*, and fully prove *malice*.

" Parents, masters and other persons having authority *in foro domestico*, may give reasonable correction to those under their care ; and if death ensue without their fault, it will be no more than accidental death. But if the correction exceed-eth the bounds of due moderation, either in the measure of it, or in the instrument made use of for that purpose, it will be

either murder or manslaughter, according to the circumstances of the case." Foster's C. L., p. 262, s. 4.

In the case before us, what was the "measure" of correction? The deceased was stripped naked, placed on his back with his feet tied up, and was kept in that position every day from morning until dinner, for the space of a week, and repeatedly whipped each day while in that position, and on the first day severely whipped. What were the "instruments" used? A heavy leather strap, a knotted cord four double, and an iron ramrod; and with these he was beaten day after day until he died. There was "due moderation" neither in the "measure" nor the "instruments." The provocation was a very slight one, and all the circumstances showed deliberation and malice. We are entirely satisfied with his Honor's ruling in this particular.

5. It being a question, whether a severe injury, supposed to be a burn, existed upon the abdomen before the death, the defendant offered to prove that the deceased *said* that he had a burn upon his abdomen. The Solicitor for the State objected to the evidence, and his Honor ruled it out. In this we think his Honor erred. The declarations of the deceased, as to the condition of his body and health at the time when the declarations were made, fall under the head of *natural evidence.* Such declarations are admissible in the very nature of things. No physician would undertake to prescribe for a patient without enquiring of him "how he felt," "where were his pains" and the like. What weight the physician will give to the patient's declarations must be for *his* consideration. And so what weigh the jury will give, is for *their* consideration. The question has been before this Court repeatedly, and need not be elaborated now. All that can be said upon the subject will be found in *Roulhac* v. *White*, 7 Ire., 63; *Biles* v. *Holmes*, 11 Ire., 16; *Lush* v. *McDaniel*, 13 Ire., 485; *Bell* v. *Morrisett*, 6 Jones, 178; *Henderson* v. *Crouse*, 7 Jones, 623.

For this error there must be a *venire de novo.* Let this be certified, &c.

PER CURIAM.                                    *Venire de novo.*