THE STATE v. TA-CHA-NA-TAH.

The Cherokee Indians who reside in North Carolina, are subject to its criminal laws.

Cohabitation between an Indian man and woman, according to the ancient customs of their tribe, which leave the parties free to dissolve the connexion at pleasure, is not marriage, and, therefore, the parties to such relation, may be compelled to testify against each other.

There is but one law of marriage for all the residents of this State.

A number of Indians had been together at a dance-house, and a fight .. had occurred there, to which the prisoner and the deceased were parties ; at the breaking up of the dance, the prisoner and another, who was also charged with the murder, were walking together towards their homes, when the deceased came up, and another fight ensued, between the prisoner and his companion on one side, and the deceased, upon the other, in thecourse of which the killing occurred : *Held,*

1. That these facts constituted no evidence of a *combination* between the persons charged, to commit the homicide :

2. That it was error to instruct the jury, that if there were previous malice on the part of the prisoner towards the deceased, then, even in case the prisoner fought in self-defence, he was guilty of murder ; and, as the Court to which the prisoner appealed could not tell how much the latter may have been prejudiced by the charge, even where the verdict was for manslaughter only, a new trial should be granted.

(*The State* v. *Jacob Johnson,* 2 Jon. 247 ; *Lovingood* v. *Smith,* 7 Jon. 601 ; *The State* v. *Harris,* 63, N. C., 1, approved ; *The State* v. *Madison Johnson,* 1 Ire. 354, observed upon.)

MURDER, tried before *Cannon, J.,* at Spring Term 1870, of JACKSON Court.

The prisoner, Ta-cha-na-tah, together with one Johnson Ta-yah-lu-tan-hih, (not upon trial,) described as Cherokee Indians, were charged with killing Ches-qua-nut, also an Indian, the former being charged as principal, and the latter as aiding and abetting. From the testimony, it appeared that the prisoners and the deceased, and a number of other Indians were assembled at a dance-house, and the appellan t

and his brother Sums-key had a quarrel there with the deceased, in which Sums-key knocked the deceased down. The two prisoners and Sums-key, in company with several others, then left the dance-house, and were proceeding on their way home, when they were overtaken by the deceased, in company with some others. There was evidence to show that when the deceased came up, he attacked Sums-key, and knocked him down, and then attacked the appellant. Appellant and deceased were fighting, each having a piece of a fence rail. While the fight was going on, the prisoner, Johnson, went behind the deceased, and stabbed him in the back, from which he died.

Ta-cha-na-tah was convicted of manslaughter, and adjudged to imprisonment in the Penitentiary, and he appealed.

*Phillips & Merrimon*, for the appellant.
*F. H. Busbee, for the Attorney-General, contra.*

RODMAN, J. (After stating the case as above,) The first objection taken, is, to the jurisdiction of the Court over the accused, by reason of his being a Cherokee Indian. The objection was not urged by the counsel for the appellant.

*Prima facie,* all persons within the State are subject to its criminal law, and within the jurisdiction of its Courts ; if any exception exists, it must be shown. On examination of the Treaty of New Echotah, Georgia, on the 29th of December 1835, between the United States and the Cherokee Indians, we find, that, by Article XII, it was provided, that individuals and families who were averse to moving West of the Mississippi River, might remain, and become citizens of the States where they resided. Our civil laws have been extended over these Indians, at least, ever since 1838 : Rev. Code, ch. 50, sec. 16 ; and this statute applies as well where the contract is between two Indians, as where one of the parties is white:

*Lovingood* v. *Smith*, 7 Jon. 601. Unless expressly excepted, our laws apply equally to all persons, irrespective of race.

2. A woman named Uh-wat-tah was offered as a witness on the part of the appellant, and was objected to by the State, because she was his wife ; she was rejected by the Judge. It was admitted by the State, that the rites of matrimony had never been performed between them according to the laws of North Carolina, or in any other form, but they merely cohabited together as man and wife, which, it was proved, was in accordance with the ancient customs of the tribe, according to which, couples were recognized as man and wife, *but could dissolve that connection at pleasure,* and marry again. It was also proved that many years before 1866, the tribe had professed Christianity, and that since that time, most of the marriages had been solemnized by a Justice of the Peace.

There is but one law of marriage in this State, which applies equally to all citizens. Our law regards marriage only as a civil contract. Every one is at liberty to superadd to that whatever sanctities his religion may require. Even if it be true, that by the law of North Carolina, a marriage *per verba de presenti* followed by cohabitation, but without any form or ceremony whatever, is to be deemed valid, (as to which we express no opinion,) yet it can never be held that mere cohabitation, with an understanding that it may cease at pleasure, can constitute a marriage, or carry with it the rights and disabilities of that relation. In *State* v. *Harriss*, 63, N. C. 1, it was held that those who had previously cohabited while slaves, might become married by proper acknowledgment before a Justice of the Peace. But that can have no bearing on the present case.

3. The appellant requested the Judge to instruct the jury, that there was *no* evidence of a combination between him and Johnson. The Judge declined to do so, and told the

jury that their being together was some evidence of a combination; and it must be supposed that he meant of a combination either to murder or to assault the deceased.

The presence of Johnson in company with the appellant at the occurrence of the homicide, and Johnson's inflicting the mortal blow while the appellant was engaged in the affray with the deceased, are the only circumstances which are set forth, which can be supposed to tend to show a combination. Without undertaking to consider whether the circumstances do not explain the common presence of the two prisoners consistently with their innocence of any unlawful combination, we do not think that the mere coincidence of the presence of the appellant and of Johnson, upon which the Judge puts it, was any evidence of an unlawful combination. The language used by the Judge would include every person who happened to be near by on occasion of a homicide, and impose on him the burden of proving that he was not an accomplice.

4. The appellant requested the Judge to charge, " that if the appellant fought deceased merely to save his own life, and did only what was necessary for that purpose, acting strictly in defence, then it was not in malice, though a previous ill-will by prisoner be shown, it not being shown that he enticed or procured the deceased to make the assault."

His Honor replied to this : " That if there was malice, the defendant was guilty." And afterwards, in response to a request on the part of the State, his Honor instructed the jury, " that if the appellant fought with deceased only in defence of his life, but yet had malice towards the deceased, then he was guilty of murder; but if with sudden passion, he was guilty of manslaughter."

We must understand the Judge when speaking of malice, to refer to malice existing antecedently to the affray, as evidenced by the previous quarrel, and not to any malice which

might be inferred from the circumstances of the affray itself.

The question, whether, where an antecedent grudge exists, and the parties between whom it exists meet and an affray ensues, and one is killed, the killing shall necessarily, or by a presumption of law, be referred to the antecedent grudge, so as to make the killing murder; or, whether the existence of malice in giving the mortal blow, shall be matter of inference for the Court or jury, from all the circumstances, of which the antecedent grudge is one, was considered with great care and ability in *Jacob Johnson's case,* 2 Jon. 274; and we think the rule there announced cannot be shaken. The latter view was there asserted. We think the instructions of his Honor differ widely from that view, and they seem to be founded on, what is said in that case to be, a mistaken view of *Madison Johnson's case,* 1 Ire., 354. His Honor refused the instruction asked for, that if the appellant fought only in self-defence and to save his own life the homicide was not malicious, although a previous ill-will were shown, and told the jury that if there was malice, (by which we understand malice implied in law from the antecedent quarrel,) the appellant was guilty of murder. In this we think there was error. It is true the jury convicted the appellant only of manslaughter, but the instructions were erroneous, and we cannot see that they did not operate prejudicially to the appellant. Our opinion on these exceptions makes it unnecessary to consider the others, which may not arise again.

There is error. Let this be certified

PER CURIAM.                                        *Venire de novo.*