GEORGE W. BAITY, Adm'r, v. ELKANA CRANFILL.

*Marriage—Legislative Power.*

1  Marriages between persons nearer of kin than first cousins (here an uncle and niece) followed by cohabition and birth of issue shall not be declared void in any proceeding after the death of either of the parties thereto.  The power of the court to declare such marages void, is confined to cases where the parties are living; for a decree of nullity affects their personal status or condition.

2. It is competent for the legislature to impose, and therefore to remove conditions in respect of the marriage relation, the subject being one of legislative regulation.  Acts of assembly reviewed by SMITH, C. J., and their retrospective operation discussed and upheld.

(*Cooke* v. *Cooke*, Phil., 583; *State* v. *Harris*, 63 N. C., 1; *State* v. *Adams*, 65 N. C., 537; *State* v. *Whitford*, 86 N. C., 636; *Long* v. *Barnes*, 87 N. C., 329; *Crump* v. *Morgan*, 3 Ired. Eq., 91, cited and approved.)

SPECIAL PROCEEDING, commenced before the clerk and heard at Spring Term, 1884, of DAVIE Superior Court, before *Gilmer, J.*

This proceeding was instituted by the plaintiff as administrator of Levi Cranfill, deceased, against the defendant as heir-at-law, to obtain an order to sell land for assets.

The facts appear in the opinion.  The plaintiff appealed from the judgment of the court below.

*Messrs. Watson &. Glenn* and *J. A. Williamson*, for plaintiff.
*Messrs. J. M. McCorkle* and *E. L. Gaither*, for defendant.

SMITH, C. J.   The defendant is a son by a former wife of the plaintiff's intestate, who after her death intermarried with Mahala Triett, his niece, on the 26th day of November, 1869, and lived with her in the relation of husband and

wife until his own death, in the year 1873. The issue of their marriage were two children, of whom one died before and the other (bearing his father's name) after the institution of the present suit.

After the grant of letters of administration to the plaintiff upon the intestate's estate, the said Mahala, as his surviving widow made application and had assigned to her in due course of law her year's allowance, almost entirely in specific articles, with a small sum to be paid in money for the deficiency which passed into her possession and absorbs the personal estate. She also instituted her action against the defendant Elkana and the son Levi, the heirs-at-law of the deceased husband, under and pursuant to which her dower was allotted and assigned in his descended lands. The defendants made no resistance to the claim of dower or the assignment when made, and informed the probate judge when he made the appointment of administrator that the said Mahala was the widow of the intestate and her child one of his next of kin.

The present action, now depending against the said Elkana alone as heir-at-law of the intestate, is to obtain an order of sale of the descended lands for the payment of debts of the decedent, and is opposed upon the ground that the marriage with said Mahala, because of their near relationship, was and remained void, and the delivery of the articles to her for her year's support under the assignment of the commissioners was a *devastavit,* for the value of which the plaintiff is personally responsible, and must account for and apply to the indebtedness before the lands can be sold for that purpose.

Two propositions are involved in the defence, and are necessary to its success, and these are :

1. The absolute and continued nullity of the marriage, and

2. The liability of the administrator for the loss of the personal estate adjudged to the widow.

The law in force at the time when the marriage was solemnized is found in the Revised Code, ch. 68, § 9, and is in these words:

"All marriages contracted after the twenty-seventh day of December, eighteen hundred and fifty-two, and all marriages in future between persons nearer of kin than first cousins, shall be void."

These and marriages contracted between a white person and a free person of color to the third generation, are the only marriages prohibited and made void by express statutory provisions, other causes of nullity being left to operate as at common law.

The legislation contained in this chapter is superseded by the enactment of February 12th, 1872, to be found in Bat. Rev., ch. 69, the second section of which defines the impediments in the way of a lawful and valid marriage, among them being a marriage "between any two persons nearer of kin than first cousins," and declares such to be *void*, subject to a proviso subjoined as follows:

Provided that no marriage followed by cohabitation and the birth of issue shall be declared void after the death of either of the parties for any of the causes stated in this section, except for that one of the parties was a white person and the other a negro or Indian, or of negro or Indian descent to the third generation inclusive, and for bigamy.

Section 2 of chapter 37 of Bat. Rev., confers upon the superior courts jurisdiction in term time of marriages contracted contrary to the prohibition in section two of chapter 69, or therein declared void, to declare and adjudge "such marriage void from the beginning subject nevertheless to the provision contained in said section," and already recited.

The succeeding section declares that the marriages interdicted between a white person and one of negro or Indian

blood within the degree specified, "shall be absolutely void to all intents and purposes and shall be so held and declared by every court at all times whether during the lives or after the death of the parties thereto." Bat. Rev., ch. 37, §§ 2 and 3.

Again, the general assembly further amended the law by extending the inhibition arising from kinship to those of half blood, but with a proviso that this shall not invalidate a marriage theretofore contracted, and that the computation as to existing marriages shall be by counting relations of the half blood, as being only half so near kin as those of the same degree of the whole blood. Acts 1879, ch. 78.

These statutory provisions are referred to, as indicating, as in our opinion they clearly do, an intention to confine the power conferred upon the court to declare void, or in a judicial proceeding to treat as void, except where the intermarriage is between the specified races or involves the offence of bigamy, to cases, whenever the power is exercised, during the lifetime of the parties, or after death, only when there has been no issue born to them. The structure and interdependence of these several sections are in harmony only when such an interpretation is put upon the proviso first quoted.

It speaks prospectively as to the exercise of the judicial authority bestowed, but it is an authority to be exercised upon all subsisting marriages before specified, when the relation may have been entered into, as well as such as may thereafter be formed. The words are "that no marriage followed by cohabitation and the birth of issue shall be declared void after the death of either of the parties for any of the causes stated in this section, except," &c., thus imposing restraints after death, not attaching during life.

If this is not the intent, why was it necessary in the act of 1879 placing kinship of the half-blood upon the same footing as kinship of the full blood, that the authority to declare void the marriages between persons so related *here-*

*tofore contracted* should not be exercised, unless in other cases of previous marriage it might be exercised? It is indeed in the nature of a statute of limitation upon the delegated or recognized judicial power, confining its exercise with a single exception to the lifetime of the parties, and, if cohabitation and offspring followed, withholding it afterwards, so as not to operate as a posthumous bastardizing of children born to them. It is but saying to the parties, thus living together and assuming the marital relation, that it shall not be disturbed after death to the injury of innocent offspring. This is in our opinion the manifest purpose expressed in the legislation.

2. Is this legislation, so interpreted and understood, effectual in its operation upon pre-existing marriage contracts, or is it ultra-constitutional?

The competency of the general assembly to impose, implies the right to remove the restraints and conditions incident to the formation of the marriage relation and the contract which creates it. There are no vested rights in the present case to be affected by the legislation. Its force is spent in fixing the personal status of parties at the death of one of them, and placing it beyond the disturbing power of the court. Its declaration to the living is that the actual status then subsisting, where a child is born, shall be and remain a legal status when death comes and dissolves the relation for the future. The parties come under the operation of this law and choose to acquiesce in the announced result, when the relation remains unbroken in life.

We see no substantial reason for denying to the legislature the right to remove impediments, that itself created, to a valid and effectual marriage, and which, but for a positive act, would not exist. In *Moore* v. *Whitaker,* 2 Harr. 50, where a similar disability from near relationship was imposed by the general law and was removed by a special enactment applicable to a single case, the court uses this forcible language in answer to a similar objection:

" The disability was a statutory one. The legislature has the power to declare what shall be valid marriages. They can annul marriages already existing, *a fortiori*, they can render valid, marriages which, when they took place, were against law. * * * The whole subject is one of legislative regulation, and the act to confirm this marriage, though contracted within the prohibited degree, disposed of all legal objection to its validity." .

The power to annul marriages is in this state withdrawn from the general assembly and committed exclusively to the courts, but in the absence of such constitutional provision, the reasoning is equally applicable to the law of this state.

A similar decision was rendered in the supreme court of Maryland, and an act validating a marriage between uncle and niece declared constitutional. *Harrison* v. *State*, 22 Md., 468. And so we have sustained legislation which retrospectively gave sanction and validity to the marriage of slaves at a period when they were incapable of entering into such contract. Acts 1866, chap. 40, § 5.

This legalizing effect was given to the relation where the cohabitation continued after emancipation from its origin, and directions are given to make this a matter of record. THE CODE, § 1842.

The validity of the statute in creating retrospectively a legal marriage relation between slaves is upheld in *Cooke* v. *Cooke*, Phil., 583 ; *State* v. *Harris*, 63 N. C., 1 ; *State* v. *Adams*, 65 N. C., 537 ; *State* v. *Whitford*, 86 N. C., 636 ; *Long* v. *Barnes*, 87 N. C., 329.

In *Cooke* v. *Cooke, supra*, the extent of and the limits to the exercise of such legislative power are thus stated by the late Chief Justice :

" If the marriage be a nullity for the want of the essence of the matter, that is, the consent of one of the parties, as in the case of *Crump* v. *Morgan*, 3 Ired. Eq., 91, where one

of the parties being lunatic the court decreed a divorce of nullity of marriage, neither a convention nor legislature, nor any other authority has power to make the marriage valid; but if the marriage be invalid by reason of the non-observance of some solemnity which is required by statute, as the presence of a minister of the gospel, or a justice of the peace, that want of form may be supplied by an ordinance of the convention."

In the latter category may be placed the obstacle of near relationship interposed by the statute.

So in *State* v. *Adams*, BOYDEN, J., declares the effect of the act to be to all intents and purposes to render the parties, thus cohabiting, man and wife, and to devolve upon each the duties and responsibilities of the married state."

The legislation in reference to the marital relations formed between slaves by their consent to live together as man and wife, is not in this feature distinguishable from that now under consideration. A mere contract between persons of different sexes, followed by cohabitation, does not constitute marriage in a legal sense between slaves as it does not between free persons.

" A slave being property," says PEARSON, C. J., " has not the legal capacity to make a contract, and is not entitled to the rights or subjected to the liabilities incident thereto. He is amenable to the criminal law, and his person (to a certain extent) and his life are protected. * * * Marriage is based upon contract, consequently the relation of man and wife cannot exist among slaves."

Hence the efficacy of the enactment was to convert an illicit into a legal relation with the consent of the freedman, and on the conditions specified in the act, whereby the status of husband and wife was acquired with such incidents, aside from criminal liability, as would attach to a marriage valid from the incipiency of cohabitation.

The act of 1879 does not, however, go so far. It does not

render the connection legitimate from the beginning, making valid that which was before void. It simply limits the time in which legal proceedings may be instituted to annul the marriage, or in which its nullity may be adjudged collaterally in a pending case, and this action must take place during the lives of both, or, where issue is born, it cannot take place at all. Death under such circumstances gives legal sanction to that which had been forbidden, and places the validity of the marriage contract beyond further question, except for the causes upon which the statute does not operate. What reasonable objection can be made to a law thus operating upon a marriage relation formed *de facto*, and not authorized because of a mere disabling statutory interdict, where the parties themselves have assented to and recognized the relation?

The proviso is broad and comprehensive in its declaration that under such circumstances after death, "no marriage followed by cohabitation, and the birth of issue (subject to the exceptions) shall be declared void," that is, adjudged void in any legal proceeding.

There could be no direct proceeding for a sentence of nullity except during life, for such sentence affects the personal status or condition of parties, and no one can represent either when dead. The meaning is that such marriage must then stand with all its legal consequences, and its validity no longer open to controversy, and such legislation is in our opinion free from complaint as to its validity.

This view disposes of the appeal and renders it unnecessary to pass upon other matters presented in the argument. There is error in the ruling of the court upon the exception and in dismissing the action. This will be certified for further proceedings in the court below according to law as declared in this opinion.

Error.                                     Reversed.