JOHN BRANCH and Sarah his wife and CAMBRIDGE BUD and Jane his wife v. SUKEY WALKER, ALBERT WALKER and others.

*Husband and Wife—Colored Persons Cohabiting as—Descent— Judge's Charge.*

1. The act of March 10, 1866, and that of February 27, 1879 (*The Code,* § 1281), in reference to colored persons cohabiting as husband and wife, &c., at times mentioned in said acts, were intended to apply for the benefit of those who occupied such relations to each other *exclusively,* and not to others at the same time.

2. Therefore, when the evidence tended to show that a former slave cohabited with a woman belonging to another owner as her husband until her death, just before the act of March, 1866, and that at the same time he lived with another woman, the slave of his owner, as her husband, and he and the latter acknowledged themselves husband and wife, according to the terms of said act, in an action about the title to his real property after his death between his children by those women respectively, born during the time

he cohabited with them both, it was *error* to charge the jury to find in favor of one and against the other party, (not because of any infirmity in the evidence of either, but because there could but one such state of things exist, to which legal sanction could be given), and to direct the jury to decide between claims equally supported by proof, instead of telling them that the statute did not in such cases apply.

CIVIL ACTION, to recover land, tried before *Gudger, J.*, at Fall Term, 1886, of the Superior Court of BERTIE.

The land in dispute had belonged to Oscar Walker, formerly a slave, who died intestate in the year 1879. The *femes* plaintiff were his daughters by Sarah Branch, a slave, who died in February, 1866. The defendant, Sukey Walker, had been a slave of Oscar's owner, and lived with him as his wife until his death. The other defendants are his children by her. The other facts sufficiently appear in the opinion.

The verdict and judgment were in favor of the plaintiffs, and the defendants appealed.

*Mr. R. B. Peebles*, for the plaintiffs.
*Mr. James E. Moore* (by brief), for the defendants.

SMITH, C. J. Soon after the late civil war, which conferred freedom upon a large class of our population, who had been slaves without capacity to enter into legal and valid marital relations, it became necessary to provide by legislation, retro-- active as well as prospective, for the results of emancipation in regard to this relation, and give it the sanction of law.

To this end was passed the act of March 10, 1866, Acts 1866, ch. 40, the fifth section of which, so far as material to the present inquiry, is in these words:

" In all cases when a man and woman, both or one of whom were lately slaves and are now emancipated, now cohabit together in the relation of husband and wife, the parties shall be deemed to have been lawfully married as

man and wife, *at the time* of the commencement of such cohabitation, although they may not have been married in due form of law. And all persons whose cohabitation is hereby ratified into a state of marriage shall go before the Clerk of the Court of Pleas and Quarter Sessions of the county in which they reside, at his office, or before some · Justice of the Peace, and acknowledge the fact of such cohabitation and the time of its commencement, and the Clerk shall enter the same in a book kept for that purpose; and if the acknowledgment be made before a Justice of the Peace, such Justice shall report the same in writing to the Clerk of the Court of Pleas and Quarter Sessions, and the Clerk shall enter the same as though the acknowledgment had been made before him, and such entry shall be deemed *prima facie* evidence of the allegations therein contained."

The next section makes it a misdemeanor for the persons coming within its provisions, and whose continued and past cohabitation may thus secure the sanction of law, to disregard its requirements and fail to go before the Clerk or Justice to have the entries made up to the 1st day of September of the same year.

In the present case, the mother of the plaintiffs who sue for the land in dispute, died in February, 1866, and herself and alleged husband did not "*now*," to use the word in the statute to designate the time when it went into operation, " cohabit together in the relation of husband and wife." The parents of the defendants, who, with their mother, are defending the action, did go before the Clerk and comply with these requirements, in order to legalize the marital relations subsisting between them.

Another statute looking to the same end was passed on February 27, 1879, found in *The Code*, § 1281, being the last of the rules of descent of real estate. It provides that "the children of colored parents, born at any time before the 1st day of January, 1868, of persons living together as man and

wife, are hereby declared legitimate children of such parents, or either one of them, with all the rights of heirs-at-law and next of kin, with respect to the estate or estates of any such parents, or either one of them."

The construction and efficacy of the validating enactment of 1866 have been before this Court several times, and both interpreted and upheld.

In *State* v. *Harris*, 63 N. C., 1, READE, J., speaking for the Court, declares " that by force of the original consent of the parties while they were slaves, renewed after they became free, and by the performance of *what was required by the statute*, they became, *to all intents and purposes, man and wife*."

The same proposition is reiterated by BOYDEN, J., in *State* v. *Adams*, 65 N. C., 537, and recognized in *State* v. *Whitford*, 86 N. C., 636, and in *Long* v. *Barnes*, 87 N. C., 329, where it is held that the acknowledgment of record, while not essential to the operation of the act, but directory only, yet a compliance furnishes *prima facie* evidence of the facts upon which its efficacy depends.

The case on appeal thus states the evidence given to the jury, upon their inquiry as to which of the two women, mothers of the contesting claimants, is, under the statute, the lawful wife of Oscar Walker, a former slave and common father of all :

There was evidence tending to show that before, and at the time of, and after the birth of the *femes* plaintiff, the said Oscar Walker and Sarah Branch lived and cohabited together as man and wife after the manner of slaves, in Bertie County ; that after 1853 and before 1860 the owner of Sarah removed to Enfield, in Halifax County, conveying Sarah with her; that Oscar visited her about twice a year until the close of the war, his last visit being at Christmas, 1865, and continued about a week, which was the usual duration of his semi-annual visits. There was other evidence tending to

show cohabitation between them, as husband and wife, in a state of slavery.

On the other hand, there was evidence tending to show that Walker lived and cohabited with the defendant Sukey, a slave woman, as man and wife; that six children were born to them before the civil war, and one during the war, who is dead, and that Albert a defendant, was at the trial about 34 years of age; that Oscar and Sukey lived together on his master's plantation, in a house with their children, and that he called her wife and she him husband; that cohabiting began some two years before the birth of their first child and continued up to and during the war; that in 1865 they so lived with their children in a separate house; that in 1866 he built a house of his own on land he had bought, and removed into it with his family; that after the enactment in 1866, and during the year, Oscar and Sukey went before the Clerk of Bertie and made the acknowledgment required, fixing the commencement of their cohabiting at twelve or fifteen years before; that thus they lived as husband and wife, their children with them, until Oscar's death, in 1869, and that the others remained, claiming possession as his widow and heirs-at-law.

It was admitted that Sukey, as such widow, had sued for and had her dower assigned in the land.

The controversy involved the conflicting claims of the issue of the woman Sarah, and of Sukey and her issue, to the property left by the deceased Oscar, and upon issues the jury find in favor of the former.

The Court charged the jury, that if the cohabiting of Oscar and Sarah, while slaves, was as man and wife, and this continued up to the latter's death (explaining the removal to Enfield and its attending circumstances), and the plaintiffs were born to them during it, then, under the act of 1879 they would be the heirs of the intestate and entitled to the land.  It would be otherwise unless such cohabiting

did exist. That, on the other hand, if the jury believe that Oscar and Sukey lived and cohabited together, while slaves, as man and wife, and such cohabitation continued up to March 10, 1866, and afterwards, and the defendants, other than Sukey, were the offspring thereof, then the act ratified such cohabitation into a marriage from its commencement, and the defendants would be entitled to the land—adding, in his own words, " that there was *no middle ground;* that Oscar could have lived and cohabited with only one of them as man and wife ; that a man could not live and cohabit as man and wife with two women at the same time, and that if so living with Sarah he could not so live with Sukey."

The exceptions are to the denial of instructions asked and *seriatim* to those given. We do not find it needful to set them out in detail. The substance of the directions to the jury was to find for the plaintiffs, if the cohabitation of their parents was maintained up to the death of the mother, as the testimony tended to show, or, on the other hand, for the defendant, if the cohabitation of Oscar with the defendant Sukey was kept up and maintained until his death, as the testimony tended to show ; but that such relation could not at the same time subsist between a man and two women.

This was not the case of a conflict of evidence about the same fact when the jury is called on to determine the matter in dispute, and to say which is entitled to credit and which is not, and when in the nature of things some of the testimony must be false and be rejected. Hence the testimony is not necessarily in conflict; for the deceased Oscar may, in dividing time, have kept up the same relations with each woman, so that separately considered they would have come within the terms of the legalizing statute, and in either case, but for the other, ripened into a valid marriage. This state of things might exist with slaves, whose intercourse with those selected as wives was generally broken and interrupted, from their being owned by different persons and

residing on separate plantations during the week of work, and sometimes a separation being for longer intervals. Such appears to have been the condition of the parties in the present case, at least in reference to Sarah, who was removed to another county some distance from her home in Bertie. It was, in one view, then, to put the case to the jury with the superadded qualification of the improbability of keeping up marital relations with both women, during the same interval, and compelling the jury, by this inexorable rule, to find in favor of one and against the other, as in case of irreconcilable evidence, when it is self-consistent, and what was testified as to each might be true. The instruction as to each contestant was not in itself erroneous, if all the proofs had been confined to the cohabitation with one woman only, and would not have misled, but when the proof covers similar relations with another woman, the direction should have been qualified by requiring the cohabitation to have been *exclusive*, a condition necessary to the operation of the curative power of the act. Its purpose and its effect are to legalize and give validity to a *single relation*, formed and maintained among the late slave population and possessing the features and conditions of marriage, the sanction of law, which it did not before have, and thus render the offspring legitimate. When it goes beyond this and assumes a polygamous form, no relief was intended to be afforded, nor could be, with justice to both.

It was misleading to tell the jury virtually, if not in words, to find in favor of one and against the other party, not because of any infirmity in the evidence as to either, but because there could but one such state of things exist, to which legal sanction could be given, and instead of directing the jury that the statute did not in such case apply, direct them to decide between claims equally supported by proof and without reference to its credibility.

Again, the jury are not advised, in passing upon the controversy, of the effect of going before the Clerk and making the acknowledgment as presenting a *prima facie* case for the parties thus acting, nor to the renewed assertion of its consequences, in a validated marriage relation, in the proceedings instituted and consummated in the allotment of dower.

On the other hand, if these be cured by the charge, finally rendered at the defendants' suggestion, as to the effect of what was done under the statutory direction in creating the legal status of marriage, these being undisputed facts, the charge should have concluded by directing the jury, if they so accept them, to find the issue of title for the defendants. But the instruction was so general as to leave the matter at large without the guidance that the jurors, under the circumstances, were entitled to look for.

The chief purpose, quite as appropriate to the proved antecedent relations of both women with Oscar, was to establish and render issue thus born legitimate *inter sese*, as the offspring of the same parent, and invest them with distributive and inheriting qualities, as if born in lawful wedlock; but it does not interfere with rights acquired under the provisions of the other enactment. For the errors pointed out it is apparent the verdict cannot be allowed to stand and must be reversed, to the end that a new trial be awarded. It is so adjudged.

*Venire de novo.*