DURANT WOODARD et al. v. DAVID BLUE et al.

*Descents—Marriage—Act of* 1879, *The Code,* § 1281, *Rule* 13.

1. The act of 1879, *The Code,* § 1281, Rule 13, is a valid law as to *descents* after its passage, and renders legitimate the children of *all* colored parents living together as man and wife, born before January 1, 1868—even the children of a woman of mixed blood, whose mother was a white woman, who lived with a slave as his wife at the time of their birth.

2. But in such cases, during slavery times, when lawful marriage between certain colored persons could not exist, though the fact of cohabiting furnishes presumptive evidence that a child is the issue of the persons thus living together, the fact is open to disproof by any evidence sufficient to overcome the presumption. The same stringent rules as to proof do not prevail as in cases of established legal marriage, where impotency, non-access and the like must be proved to rebut the presumption of legitimacy.

3. Where the mother of the person claiming to be heir of the decedent, who was a slave at the time of the birth, had testified that she and decedent had been married and cohabited as husband and wife, it was competent to show by another witness that she had often declared that the claimant was not decedent's but another named person's child, at least to *impeach* her credit; and there being opposing testimony as to cohabitation about the time of the birth, it was material as to that essential matter.

Civil action, for the recovery of land, tried before *Arm-field, J.*, at Spring Term, 1889, of the Superior Court of Burke County.

The plaintiff Emily, wife of the plaintiff Durant Woodard, claiming to be the daughter and sole heir-at-law of Underzine Pelott, and the other plaintiff, Mourning Crisp, claiming to be his surviving widow, sue the defendants, who are in possession of the several tracts of land mentioned and described in the complaint, to establish their title to and to recover the same, with damages for the withholding.

The defendants admit that the intestate owned said lands at the time of his death, and their holding under Tom Walton and certain others named, to whom, as his rightful heirs, descended all the said tracts except that described as No. 2, as to which certain equities are set up in behalf of said Tom Walton, growing out of his furnishing a part of the purchase money therefor, and the intestate's agreement, as alleged, to have the title conveyed to them jointly.

Thereupon, issues were made up and submitted to the jury, which, with their respective responses, are as follows:

1. "Is the plaintiff Mourning Crisp the widow of Underzine Pelott, and entitled to dower in the lands in controversy?"   Answer, "No."

2. "Is the plaintiff Emily Woodard, wife of Durant Woodard, the only heir-at-law of the said Underzine Pelott?" Answer, "Yes."

3. "Is the said Mourning Crisp, as widow of Underzine Pelott, and Emily Woodard, as his only heir-at-law, entitled to the possession of the land described in the complaint?" Answer, "Not Mourning Crisp, but Emily Woodard, is."

The said Mourning, examined at the trial on behalf of the plaintiffs, testified to her marriage with the deceased, before a Justice of the Peace, about ten years before the war, he then being a slave and herself the offspring of a white mother; their cohabitation, as husband and wife, for a period

during which their children were born, of whom one was the plaintiff Emily, and its discontinuance since the termination of the war, though the said Underzine lived until a year or two before the institution of this suit, when he died.

During the cross-examination, the defendants put this question to the witness:

"Have you not repeatedly told Tom Walton, a slave, brother of Underzine, belonging, with him, to the same owner, and living in the same family at the time when Emily was born, that Emily was not Underzine's child?"

On objection of plaintiffs, the inquiry was disallowed, except to impeach the witness, and defendants excepted.

The defendants insisted that the marriage, being between a white woman and a slave, was void in law, and that such intermarriage between a free person of color and a slave is expressly forbidden by the statute (Rev. Stats., ch. 111, § 77); nor is it protected by the amendatory act of January 9, 1845 (Acts 1844–'45, ch. 85), which allows such intermarriage when entered into with the owner's consent, previous to the passing of the act.

The Court expressing an opinion that the act of 1879 covered the present case, and has the effect of rendering all children born in slavery, where the parties were living as man and wife, capable of inheriting, but reserving a decision upon the point, the defendants proceeded to call their witnesses and develop their testimony.

Tom Walton, being sworn, testified as follows: Underzine and Mourning were regarded as man and wife when they went to Tennessee, to the farm whereon witness worked with them, and where they remained four or five years, during which time Emily was born. Mourning stayed sometimes at the house where Underzine stayed, and sometimes at the big house, he being a field hand and she a house servant; they did not live as man and wife while there.

Defendant offered to prove a general reputation in the family that the *feme* plaintiff was not Underzine's child, but that another person was her father. The evidence was held to be incompetent if the parties were then cohabiting, and to this ruling the defendants excepted.

Defendants then proposed to show that Underzine and Mourning each had repeatedly declared that the former was not the father of said Emily, and that, though living in the same family, there had been no actual sexual connection of which she could be the fruit, and her actual father was the man with whom they lived, and who had been the owner of Underzine while a slave; that the parties left Tennessee after the close of the war, and settled in Burke County, living about eight miles apart, where they remained until his death, he, meanwhile, having no connection whatever with Mourning and her daughter, and, from his emancipation, at all times repudiating and disowning any relation to either.

The Court, ruling the offered evidence irrelevant and incompetent, stated that the jury would be directed to find upon the issues: in response to the first, "No"; to the second, "Yes"; to the third, "No," as to Mourning; "Yes" as to Emily and Durant, "if the parties were married and were living together and cohabiting as man and wife when the plaintiff Emily was begotten and born."

In deference to this intimation, defendants' counsel said they could not resist a verdict, and it was rendered accordingly, and from the judgment they appealed.

*Messrs. S. J. Ervin* and *I. T. Avery,* for the plaintiffs.
*Messrs. J. T. Perkins* and *F. A. Sondley,* for the defendants.

SMITH, C. J. (after stating the case). At the time when the alleged marriage was contracted, Underzine was a negro slave, and Mourning the daughter of a white woman, and if not herself white, necessarily of mixed blood, and, whether

one or the other, equally disabled, by positive law, to enter into a contract of marriage with a slave.

By an act passed in 1741, it is declared that if any white man or woman, being free, shall intermarry with an Indian, negro, mustee or mulatto man or woman, or any person of mixed blood, to the third generation, bond or free, such person shall forfeit and pay, to the use of the county, one hundred dollars, and a penalty is imposed upon any minister or Justice of the Peace who knowingly shall presume to marry such.   Rev. Stat., ch. 71, § 56.

The act of 1838 declares all marriages entered into since January 8, 1839, or thereafter entered into, " between a white person and a free negro, or free person of color, to the third generation, shall be void."   Rev. Code, ch. 68, § 7.

This latter enactment does not extend as far as that which prohibits and annexes a penalty to the act of intermarrying of a white with a person of color, whether bond or free, but confines its operative force to annulling of marriage attempted between a white person and a free negro or free person of color.   The restraint thus limited became inapplicable to the case of a white person marrying a slave, because there was in the latter an incapacity, arising from the *status* of the slave, to make such contract, and it was, *ipso facto*, without any statute making it so, void.   In like manner the intermarriage of a free negro and slave was prohibited by the act of 1830 (Rev. Stat., ch. 111, § 87), an offence for which the free person of color was subjected to indictment, unless the same was with the consent of the owner of the slave, under the amendment of 1844 (Rev. Code, ch. 107, § 61), given to a marriage which took place previous to November 1, 1844.

This legislation continued in force during the existence of slavery, no marriage being recognized as binding when had between slaves, and inhibited by positive law when had

103—8

between white and free persons of color, who are within the specified degrees, and between the latter and slaves, and this in pursuance of a general public policy growing out of the slavery of a part of the population owned by masters. It still prevails, and inhibits the intermarriage of white and free persons of color into which the slave population had been immerged. *The Code*, § 1810. This interdict is still in force, and held not to be repugnant to the Constitution of the United States, or legislation under it, in *State* v. *Hairston*, 63 N. C., 451, though the relation, if *legally created* elsewhere, is recognized as a valid subsisting relation, when the parties come into this State from that of their former residence. *State* v. *Ross*, 76 N. C., 242. But its validity is not recognized when parties, having their domicile here, to evade our laws, go to a State which allows such marriage, with intent to return and keep up their domicile. *State* v. *Kennedy, ibid*, 251.

As no provision was made by law giving sanction to the marriage relation formed between slaves, while there was no absolute restriction put upon free persons of color, and they could intermarry one with another, while they could not with white persons or slaves, it became necessary to provide by law for the legalizing of marriages between slaves who could not enter into any marriage contract, and the General Assembly passed the act of March 10, 1866.

The fifth section, which alone bears upon the present inquiry, legalizes a cohabitation among those who were lately slaves, when still continued, and validates the relation as a marriage from its commencement; and, to give the act full force, directs the parties to go before the Clerk or a Justice in acknowledgment of assent, and to state the time when it began. This enactment has been considered at the present term, in *Branch* v. *Walker*, and obviously imparts no sanction to the cohabitation alleged in the present case.

The act of February, 1879, adds to the canons of descent, and is in these words:

" The children of colored parents, born at any time before the 1st day of January, 1868, of persons living together as husband and wife, are hereby declared legitimate children of such parents, or either one of them, with all the rights of heirs-at law and next of kin, with respect to the estate or estates of such parents, or either one of them."

The interpretation put upon the broad and comprehensive terms of the statute, as embracing the issue of all colored persons while living as husband and wife, as well when forbidden as permitted by law, determines the ruling of the Judge in support of the claim of the plaintiff Emily as heir-at-law of the intestate Underzine to the lands left by him.

In general words, literally understood, the act does include the children *of all colored parents*, as well those who were always free as those who were formerly slaves (for they all now belong to one and the same class), and its legal effect would be to bestow an inheriting capacity upon all whose parents were thus cohabiting, irrespective of the lawfulness of the relation, and thus sustain the ruling of the Court in applying its remedial provisions to the case before us. It admits of serious doubt whether the statute, in seeking to remove an anomalous condition of the colored race, growing out of the emancipation of the slave population, intended to ignore the unlawful sexual intercourse, so habitually maintained as to assume the form of marriage, and become a cohabitation among the free colored race, to whose lawful intermarriage no impediment not common to all was interposed, and thus place the offspring of a forbidden upon an equal footing with the offspring of a lawful union, in giving the right of succession to an intestate father's estate. The special purpose of the legislation seems to have been to provide against the evil of the universal illegitimacy of slave children, consequent upon the absence of any authority for

their parents, during their servitude, to enter into lawful matrimonial relations; and this is developed in the early enactment of 1866.

But the act of 1879, in unrestricted words, bestows a right to succeed to a deceased parent's estate, not disposed of by will, upon "*the children of colored persons*," born before January, 1868, without exception or qualification, and we do not see how, by construction, any words restricting its operation can be interpolated.

Its efficacy, however, depends upon two essential conditions—a cohabitation subsisting at the birth of the child, and the paternity of the party from whom the property claimed is derived. The cohabiting does not alone confer legitimacy, though it furnishes presumptive evidence that the child is the issue of the persons thus living and indicating their relations; but the presumed fact is open to disproof, and to be determined, as are other facts, upon the force of the evidence adduced, which may be sufficient to overcome the presumption.

To repel the inference of paternity, drawn from the mere fact of cohabitation, the same stringent rules do not prevail as in cases of established legal marriage, when, to bastardize the issue, there must be full, affirmative, repelling proof, such as impotency, non-access and the like, or the presumption of legitimacy will stand. 1 Green. Ev., § 28; Abbott's Trial Ev., 88.

The question of the real, as distinct from the inferred, paternity of the plaintiff Emily, involves a fact as essential to the support of her claim as cohabitation itself, and while the one may be deduced from the other, nothing else appearing, is susceptible of disproof, and, when any has been offered, must be left to the jury to pass upon.

In the trial, Mourning, the mother, swore that, during the cohabitation, the plaintiff Emily and two other children were born (in what order of time is not stated), and that

Underzine and herself "had never lived together since the war, that is, from 1865, up to his death, a year or so before the issuing of the summons in June, 1888, a period of more than twenty years."

The defendants' opposing evidence, that the parties, though upon the same farm, " did not live as man and wife " when Emily was born, and all the evidence, concurs in showing that the relation ceased after their return to the State. Here there was conflicting evidence of the existence of the cohabitation, previously kept up, after the removal to Tennessee, and the time of its discontinuance, whether before or after the birth of Emily, left in doubt upon the testimony.

Again, the defendants were not allowed to introduce evidence of the declarations often made, as well by Underzine as by Mourning, that he *was not*, while his master, in whose house Mourning served as a domestic, was, the father of Emily, and that such was the general reputation in the family. The proposed testimony was declared to be incompetent, if the cohabiting then subsisted; thus, as we understand the ruling, holding the *quantum* and quality of the evidence sufficient to warrant the finding the same as that required to prove illegitimacy of a child born in lawful wedlock.

It does not appear that this testimony was admitted for any purpose, not even in contradiction of the testimony of Mourning, and to impair her credit, as was ruled when her declarations were called for upon her cross-examination. It may be that the declarations were not allowed as original evidence of the fact declared, in which ruling we cannot say there was error, but as the case is careful to state that a similar declaration, sought to be brought out from the mother when under examination, was held admissible to impeach her credit, and admits the qualification in passing upon the proof by other witnesses of similar declarations, we are not

at liberty to annex a similar qualification to the ruling upon the evidence last offered.

The rejected evidence was certainly competent as to the credit of the mother, and material, too, because her testimony is in direct conflict with that of Tom Walton, upon the essential matter of the continuance of the cohabitation in Tennessee.

This view is forcibly suggested by the course of defendants' counsel in making no resistance to the verdict, after the intimation of the opinion of the Court, when there had been developed so much opposing testimony to the fact upon which the legitimacy given by the statute depends.

For these reasons, we think the case was not fairly before the jury, with such directions as to the proofs as were needed to guide them to a correct verdict, and it must be set aside, and a new trial granted

We do not see any want of authority in the General Assembly to pass the act of 1879, which is but a change in the law of descent, and operative in the future only.

Error. *Venire de novo.*