## ISAAC CROOM v. L. H. WHITEHEAD.

(Filed 17 October, 1917.)

**1. Descent and Distribution—Evidence—Paternity—Deeds and Conveyances.**

Where plaintiff claims the lands in controversy through his father, C., from one he alleges to be his grandfather, and the paternity of his father is denied, and claimed to be one W., it is error to admit evidence from the register of deeds' record of a deed to plaintiff's father from a stranger, showing that W. had been erased and C. interlined, without evidence as to by whom it was made, when or by what authority, or that it so appeared in the original deed; and it is reversible error when the court, in his charge to the jury, upon conflicting evidence, made it material to their consideration upon the issue.

**2. Descent and Distribution—Slaves—Statutes—Marriage—Inheritance.**

The act of 1866, declaring that former slaves who "now cohabit together in the relation of husband and wife  .  .  .  shall be deemed to have been lawfully married as man and wife, at the time of the commencement of such cohabitation," deals with marriage, making the legitimacy of children and the right to inherit lands depend upon their parents' cohabitation at the birth of the issue, and its continuance to the ratification of the act; while the act of 1879, now Rule 13, sec. 1556, Canons of Descents, does not validate the cohabitation, but simply confers the right on colored children born before 1868 to inherit, and this right is limited to the estates of the parents.

20—174

3. **Same—Cohabitation—Acceptance—Retroactive Acts.**

Where former slaves have cohabited together before and at the time of the ratification of the act of 1866, their continuing in this relation thereafter is construed as their consent to the marriage therein declared to be lawful, and retroactive in the respect that it relates back to the beginning of the cohabitation, without the necessity of their having acknowledged the cohabitation before the clerk, etc., or justice, etc., as directed by the act.

4. **Descent and Distribution—Slaves—Statutes—Exclusive Marriage.**

Under Revisal, sec. 1556, Rule 13 of Descents, declaring legitimate children of colored parents born at any time before 1 January, 1868, under certain conditions, it is required that cohabitation shall have existed at the birth of the child claiming the inheritance, and the paternity of the party from whom the property claimed is derived must be shown; and under this section and the Laws of 1866 the cohabitation must be exclusive, in that it was a single and not a polygamous relation.

5. **Descent and Distribution — Paternity—Declarations—Evidence—Trials—Instructions.**

Where an inheritance is claimed by the relation of former slaves declared to be a lawful marriage by the act of 1866, and the evidence is conflicting as to whether the facts establish a lawful marriage within its terms, declarations of the mother as to the paternity of one through whom the claimant seeks to derive title are competent or not depending upon the establishment of the fact of marriage, and under conflicting evidence thereof, such evidence should be admitted on the trial, with instructions to the jury to disregard it if they find affirmatively upon that question.

APPEAL by plaintiff from *Cox, J.,* at the February Term, 1917, of CRAVEN.

This action is for the recovery of a tract of land. The land belonged to Robert Croom, and the plaintiff claims that upon the death of Robert Croom the land descended to Robert's son, Isaiah Croom, who was the father of the plaintiff, Isaac Croom, to whom it descended upon the death of his father, Isaiah. The defendant denied plaintiff's right to possession upon the ground that Isaiah Croom was not the son of Robert Croom. The appeal involves the trial of the issue, whether Isaiah Croom, the father of plaintiff Isaac Croom was the son of Robert Croom.

Robert Croom and Susan Croom, alleged by the plaintiff Isaac Croom to be his grandfather and grandmother, were slaves. The evidence of the plaintiff tends to show that they lived together as man and wife for several years prior to the Civil War, during which period the plaintiff's father, Isaac Croom, was born; that they continued to live together as man and wife until Robert "was carried South after the first raid of the Yankees"; that when Robert Croom was carried South, Susan had a little black boy, Isaiah, father of plaintiff; that directly after the war Robert came back, and Susan then had two other children; that Robert

and Susan lived together after he came back, and after a year or two Robert and Susan moved near Dover; that after the war Robert Croom and Susan Croom were married by a justice of the peace, Nathan Mc-Daniel.

The evidence of the defendant tended to prove that Robert and Susan did not live together as husband and wife, and that one Wood, and not Robert Croom, was the father of Isaiah.

The defendant was permitted to introduce the declarations of Susan, mother of Isaiah, that Wood was his father, and the plaintiff excepted.

W. H. Waters, a witness for defendant, testified that Susan told him Wood was the father of Isaiah, and that Isaiah was known as Isaiah Wood.

The defendant, in corroboration of the witness, offered in evidence Deed Book No. 159, page 132, from the office of the Register of Deeds of Craven County, showing a deed dated 1 June, 1888, from Mark Mc-Clesse to Isaiah Croom, the word "Croom" being interlined in place of the word "Wood," erased.

Objection by plaintiff; objection overruled, and the plaintiff excepted.

There was a verdict and judgment for the defendant, and the plaintiff appealed.

*Dickinson & Land and Rouse & Rouse for plaintiff.*
*D. L. Ward and D. E. Henderson for defendant.*

ALLEN, J. There is no principle which will sustain the ruling of his Honor admitting in evidence the record of the deed from Mark Mc-Clesse to Isaiah Croom, on which it appears "Wood," which was first written, was stricken out and "Croom" written in its place. It is not shown who made the change, when it was made, or by whose authority, and there is no evidence that there was a similar erasure and interlineation on the original deed, or that Isaiah Croom or the plaintiff knew of the condition of the record, and neither claimed under a deed to Isaiah Wood. So far as we can see, the register of deeds, when copying the deed on the record, by mistake, first wrote Isaiah Wood as the grantee in the deed and at once corrected the mistake by writing Isaiah Croom, the true grantee.

His Honor admitted the evidence and told the jury it was in corroboration of a witness who testified that the mother of Isaiah told him that Wood was his father, and afterwards, in his charge, he called the evidence to the attention of the jury and told them to take it "into consideration in determining whether this boy was the son of Robert or the son of a man named Wood."

The evidence was conflicting as to the paternity of Isaiah, and when this prominence was given to the change in the record, which was doubtless used before the jury as a declaration of the register of deeds, we cannot say the error is harmless. This is sufficient to dispose of the appeal, but there are other questions of evidence we will consider, as they will necessarily arise on another trial.

The defendant was permitted to introduce the declarations of the mother of Isaiah to the effect he was the son of one Wood, and not of Robert Croom. The competency of this evidence depends on the legal status existing between Robert and Susan Croom at the birth of Isaiah, because if they were then married, and Isaiah was born in wedlock, the declarations of the mother made in 1911 or 1912 would not be competent to prove that Isaiah was not the son of Robert. *West v. Redmond,* 171 N. C., 742.

Robert and Susan were slaves, and the evidence of the plaintiff tended to prove that they were cohabiting as man and wife when Isaiah was born, and that this relationship continued up to and after the ratification of the Act of 1866, which is as follows:

"In all cases when a man and woman, both or one of whom were lately slaves and now emancipated, now cohabit together in the relation of husband and wife, the parties shall be deemed to have been lawfully married as man and wife *at the time* of the commencement of such cohabitation, although they may not have been married in due form of law. And all persons whose cohabitation is hereby ratified into a state of marriage shall go before the clerk of the court of pleas and quarter sessions of the county in which they reside, at his office, or before some justice of the peace, and acknowledge the fact of such cohabitation and the time of its commencement, and the clerk shall enter the same in a book kept for that purpose; and if the acknowledgment be made before a justice of the peace, such justice shall report the same in writing to the clerk of the court of pleas and quarter sessions, and the clerk shall enter the same as though the acknowledgment had been made before him, and such entry shall be deemed *prima facie* evidence of all the allegations therein contained."

This statute was considered in *S. v. Harris,* 63 N. C., 3, and the Court said: "The substance of marriage—the consent of the parties—existing, it was as clearly within the power of the Legislature to dispense with any particular formality as it was to prescribe such. This neither made nor impaired the contract, but gave effect to the parties' consent, and recognized as a legal relation that which the parties had constituted a natural one. So that by force of the original consent of the parties while they were slaves, renewed after they became free, and by the performance of what was required by the statute, they became

to all intents and purposes man and wife. This would be so upon the *strictest* construction; much more, then, upon the liberal construction which would be given to a statute of great public necessity affecting the domestic relations of one-third of our people and the morals of society in general."

Soon thereafter it was held in *S. v. Adams,* 65 N. C., 538, which was followed in *S. v. Whitford,* 86 N. C., 639, and in *Long v. Barnes,* 87 N. C., 332, that going before the clerk or a justice of the peace was not essential to the marriage; and in *S. v. Melton,* 120 N. C., 595, that consent followed by cohabitation, existing when the Act of 1866 was ratified, constituted a valid marriage.

It is necessary that the cohabitation should exist at the time of the ratification of the act, because by its terms it only applies to those who *"now* cohabit together in the relation of husband and wife," and the statute operates retrospectively by reason of the language "shall be deemed to have been lawfully married as man and wife *at the time of the commencement of such cohabitation."*

The validity of the retrospective feature of the statute was recognized in *Baity v. Cranfill,* 91 N. C., 298, and is supported by the reasoning in the other cases cited, and it is said in *S. v. Whitford,* 86 N. C., 639, that living together after the ratification of the act is "plenary," and in *Long v. Barnes,* 87 N. C., 332, "conclusive" evidence of consent.

The result of these cases is that, under the Act of '66, if it is shown that the man and woman, being slaves, lived together as husband and wife at the birth of issue, and if this relationship existed at the time of the ratification of the act, then they are in law husband and wife from the commencement of the cohabitation, and the issue is legitimate and born in wedlock.

Under this construction of the act many children born of slaves who had lived as husband and wife were declared illegitimate because one or both of the parents had died before the ratification of the act, or on account of inability to make proof of cohabitation existing at that time; and to meet this condition, the Act of 1879 was passed (now Rlue 13 of the Canons of Descents), which is as follows:

"The children of colored parents born at any time before the first day of January, one thousand eight hundred and sixty-eight, of parents living together as man and wife, are hereby declared legitimate and children of such parents, or either one of them, with all the rights of heirs at law and next of kin, with respect to the estate or estates of any such parents, or either one of them. If such children be dead, their issue shall represent them, with all the rights of heirs at law and next of kin provided by this section for their deceased parents, or either of them, if they had been living, and the provision of this section shall

apply to the estate of such children as are now deceased or otherwise."

The two essential conditions necessary to give effect to this last act are "cohabitation existing at the birth of the child, and the paternity of the party from whom the property claimed is derived" (*Woodard v. Blue,* 103 N. C., 116; *S c.,* 107 N.. C., 410), and under both acts the cohabitation must be exclusive in the sense that it must show a single, not a polygamous, relation. *Branch v. Walker,* 102 N. C., 40.

It was not intended to require that living together as husband and wife should be "enduring or in strict personal fidelity while it continued" (*Hall v. Fleming,* at this term), or that a single act of infidelity on the part of the parents should have the effect of destroying the provisions of the statutes, primarily enacted to legitimate the offspring.

There is this marked distinction between the two statutes, which is important in dealing with the competency of the declarations of a parent. The first deals with marriage, and it is because the relationship of husband and wife is established that the children born in wedlock are legitimate, while the Act of 1879 does not validate the cohabitation, but simply confers the right to inherit, and this right is limited to the statutes of the parents. *Bettis v. Avery,* 140 N. C., 187.

Applying these principles, we would hold on the plaintiff's evidence, which, if believed, shows a valid marriage under the act of '66; that the declarations of the mother, tending to prove illegitimacy, were incompetent, but as the evidence as to marriage is conflicting, his Honor could not do otherwise than admit them, but he ought to have instructed the jury in connection therewith, that if they found from the evidence that Robert and Susan were living as husband and wife when Isaiah was born, and that this status existed at the time the Act of '66 was ratified, then they were husband and wife, and in that event they should exclude these declarations from further consideration.

In *Woodard v. Blue, supra,* where there was no marriage under the act, and the party had to claim under the Act of 1879, if at all, declarations of the mother were received.

In *Erwin v. Bailey, supra,* and in *Mebane v. Capehart,* 127 N. C., 50, in which the marriages were valid under the Act of '66, evidence of quarrels between the husband and wife as to the paternity of the child, and declarations of the mother tending to show illegitimacy, were admitted, but the distinction we have endeavored to point out was not considered, and in the later case both *Woodard v. Blue,* under the Act of '79, and *Erwin v. Bailey,* under the Act of '66, are cited in support of the ruling.

The question of the admissibility of general reputation to prove illegitimacy is not presented, as no witness was asked as to the reputation, but several were erroneously permitted to say he had not heard of

Robert and Susan living as husband and wife without stating the repu-
tation as to the fact, or that they knew it. See, on this point, *Spaugh
v. Hartman,* 150 N. C., 456, and other cases.

New trial.