Taylor, Chief-Justice,
 

 delivered the opinion of the Court:
 

 After stating the points, he observed, that it does not appear from any direct proof in the case, what was the immediate provocation under which the homicide was committed. The evidence relative to that is altogether circumstantial and presumptive, and its weight and effect required the most careful examination and deliberation of the Jury. The conclusion they might arrive at was all-important to the prisoner, since the degree of the homicide depended on it | and whether it was malicious, extenuated or excusable, must have been determined by them from such lights as they could gather from the facts actually proved, and such inferences as they might deduce from them. It cannot be doubted that the temper and disposition of the deceased, and his usual deportment towards white persons, might have an important bearing on this enquiry, and according to the aspect in which it was presented to the Jury, tend to direct their judgment as to the degree of provocation received by the prisoner. If the general behaviour of the deceased was marked with turbulence and insolence, it might, in con- . nexion with the threats, quarrels and existing causes of resentment he had against the prisoner, increase the probability that the latter had acted under a strong and legal provocation. If, on the contrary, the beha^ioiu- fji'v* the deceased was usually mild and respectful'' towards ' white persons, nothing could be added by it to the force of the other circumstances. They must still depend upon their own weight and the probability be lessened, that the prisoner had received, a provocation sufficient in
 
 *217
 
 point of law to extenuate the homicide. The evidence therefore‘ought to have been received 5 and this will be the more apparent when the charge to the Jury is considered.
 

 The Court directed the Jury, that under the act of 1817, the case was to be determined by the same rules and principles of law as if the deceased had been a white man. The act referred to, had no design beyond that of authorising a conviction for manslaughter, in cases where a slave was killed under a legal provocation. If, before that time, a white person had killed a slave under such circumstances as constituted murder, he might have been convicted and punished for that offence ; but if the homicide was extenuated to manslaughter, no punishment was annexed to that offence, and the accused persons were uniformly acquitted. It seemed just to the Legislature, that the manslaughter of a slave should be punished in the same manner with that of a white person. This they have provided for, and it is all they intended to provide for. They did not mean to declare that homicide, where a slave is killed, could be only extenuated by such a provocation as would have the same effect where a white person was killed. The different degrees of homicide, they left to be ascertained by the Common Law of the country — a system which adapts itself to the habits, institutions and actual condition of the citizens, and which is not the result of the wisdom of any one man, or society of men, in any one ago, but of the wisdom and experience of many ages of wise and-discreet men. It exists in the nature of things, that where slavery prevails, the relation between a white man and a slave differs from that, which subsists between free
 
 persons;
 
 and every individual in the community feels and understands, that' the homicide of a slave may be extenuated by acts, which would not produce a legal provocation if done by a white person. To define and limit these acts, would be impossible, but the sense,and feelings of Jurors, and the grave
 
 *218
 
 discretion of Courts* can never be at a loss in estimating their force as they arise, and applying them to each particular case, with a due regard to the rights respectively belonging to the slave and white man — to the just claims of humanity, and to the supreme law, the safety of the citizens. An example may illustrate what is meant. It is a rule of' law, that neither words of reproach, insulting gestures, nor a trespass against goods or land, are provocations sufficient to free the party killing from the guilt of murder, where he made use of a deadly weapon. But it can not bo laid down as a rule, that some of these provocations, if offered by a slave, well known to be turbulent and disorderly, would not extenuate the killing, if it were instantly done under the heat of passion, and without circumstances of cruelty.
 

 The charge of the Court proceeds to state,
 
 “
 
 that by the Common Law, a slight blow, if it did not threaten death or great bodily harm, would not excuse or extenuate, if the instrument used was a deadly one.” It does not appear from the case, that a blow of any kind was given by the deceased to the prisoner, or that any struggle immediately preceded the
 
 homicide;
 
 hut as it was impossible for the/ Court to foresee what inferences might be drawn by the Jury from the testimony adduced and the circumstances proved, this part of the instruction was given them, that they might be enabled to estimate the provocation, in the event of their being satisfied that a blow was given. In such a case, the Jury might have been misled if the charge be incorrect: and I think it was so, because it lays down as a general rule, what is true only under peculiar circumstances, and in cases where a slight blow is cruelly revenged.
 

 The first proposition, that such a blow will not
 
 excuse,
 
 is legally correct ; for in order to reduce a homicide to excusable self-defence, it is incumbent upon the accused to prove, that he killed his adversary through -mere necessity in order to avoid immediate death. It is
 
 *219
 
 manifest that such necessity never could be produced by such a blow as that described. But when the charge affirms,
 
 “
 
 that a slight blow, not threatening death or * great bodily harm, will not extenuate a homicide, if the weapon be a deadly one,” it authorises the inference, that a blow, to constitute a legal provocation,
 
 must
 
 threaten death or great bodily harm. This, however, is no part of the description of a blow, which all the authorities hold sufficient to extenuate. For if it amount to a breach of the peace, and offer an indignity to the person receiving it, it is generally conceded, that it will extenuate the homicide to manslaughter, although a deadly weapon bo used. Accordingly, it is laid down by
 
 Hawk
 
 ins,
 
 “
 
 if one man, upon angry words, shall make an assault upon another, either by pulling him by the nose, or filliping him upon the forehead, and he that is so assaulted draw his sword and immediately run the other through, that is but manslaughter.” The same passage is quoted with approbation by
 
 Kelyng;
 

 *
 

 and J take the sound principle to be, that if any assault made with violence or circumstances of indignity upon a man’s person, be resented immediately by the death of the aggressor, and he who is assaulted act in the heat of blood, and upon that provocation, it will be but manslaughter. When, therefore, a Court is called upon to pronounce the general rule, it should be that
 
 “
 
 words are not a sufficient provocation : but blows are a sufficient provocation to lessen the crime into manslaughter.”
 
 †
 
 Borne cases, however, have been attended with peculiar circumstances, shewing the necessity of a inore critical and precise limitation of the rule. The first is
 
 Stedmm’s ease,
 
 quoted in
 
 East’s Crown Law.
 

 ‡
 

 In that case, the provocation first disclosed was a box on the ear given by a woman to a soldier: in return, he struck her on the breast with the pommel of his sword : and afterwards he pursued her and stabbed her in the back.
 
 Holt
 
 was of
 
 *220
 
 opinion that this, was murder — a single box on the car ^rom a woman> wot being a sufficient provocation to kill
 
 in this
 
 manner, after he liad given a blow in return for the box on thee ear. But it was afterwards held to be manslaughter, because it appeared that the woman struck with an iron patten, and drew a great deal of blood. The other case, is
 
 Rex
 
 v.
 
 Reason
 
 &
 
 Trauter;
 

 *
 

 upon which, as reported, Mr. Justice
 
 Foster
 
 calls it an extraordinary case, that all the circumstances of aggravation — two to one — Mr. Luttrel helpless and on the ground, begging for mercy, stabbed in nine places, and then dispatched with a pistol — that all these circumstances, plain indications of a deadly revenge or diabolical fury, should not outweigh a slight stroke with a cane. These cases speak plainly for themselves, and do not amount even to an exception to the rule, but are evidently founded upon the protracted and unrelenting cruelty, with which the prisoners pursued their revenge out of all proportion to the provocation. But if in
 
 Stedman’s case,
 
 he had instantly upon receiving the box on the ear, stabbed the
 
 woman;
 
 and the officer, in the other case, had stabbed Mr. Luttrel upon receiving the blow with the cane, the cases must have been pronounced to be manslaughter. Upon the whole of the case, therefore, I think the prisoner is entitled to a new trial,
 

 *
 

 135.
 

 †
 

 Taylor’s case, 5 Bur. Rep. 2790,
 

 ‡
 

 234.
 

 *
 

 1 Strange 499.