STATE v. DAVID BARNWELL.

*Murder—Evidence—Judge's Charge—Malice.*

1. When properly moved by counsel, and when the evidence makes the distinction relevant, it is error for the judge to fail to discriminate between a homicide where the prisoner enters the fight with a deadly weapon prepared beforehand, and one, where being hotly pressed, he uses such a weapon on the impulse of the moment. To ignore the distinction in such case is to confound murder and manslaughter.

2. Where, on a trial for murder, express malice is shown to have once existed, but a subsequent reconciliation, followed by fresh provocation, is proved, the law will refer the motive of the slayer to the recent provocation and not to the antecedent malice, unless the special circumstances of the case forbid such a presumption.

(*State* v. *Hill*, 4 Dev. & Bat., 491; *Jacob Johnson's case*, 2 Jones, 247; *Madison Johnson's*, 1 Ire., 354; *State* v. *Floyd*, 6 Jones, 392, cited, commented on and approved.)

INDICTMENT for Murder tried at Spring Term, 1878, of Buncombe Superior Court, before *Cloud*, J.

The prisoner was indicted for killing Anderson Garron, and the only witness introduced by the state who saw the difficulty was one M. T. Benefield, who testified substantially as follows :—On Saturday the 24th of November, 1877, the prisoner, deceased and witness, with a four ox team, two of which with the wagon belonged to deceased, and the other two to witness, hauled from Henderson county to Asheville,

a distance of twenty miles, some household furniture and other chattels for a Mrs. Maxwell, who lived in Asheville. The deceased had been hired by prisoner, and the witness by Mrs. Maxwell to do the hauling. They arrived at her house about dark, and after driving into the yard, unyoked the oxen, witness hitching his to a tree near the dwelling, and deceased his to a fence near the wagon.

The prisoner was a brother-in-law of Mrs. Maxwell, and the deceased a brother-in-law of the prisoner. After supper the deceased proposed to unload the wagon, but the prisoner suggested that they wait until Monday morning, as he might be fined for unloading on Sunday in violation of a town ordinance. Deceased then went to a neighbor's house and on inquiring was informed that it was about ten o'clock. When he returned, the prisoner was in the house and again said, wait till Monday, but deceased refused, saying he was not going to stay there on expense. Prisoner asked witness to prevail on him to stay until Monday. Deceased then got in the wagon, and commenced cursing and throwing out the chattels; prisoner said "hold on and I'll help you unload;" deceased replied "d—n you if you are going to do anything, go to work, don't stand there;" prisoner walked off towards the house without saying anything; deceased continued throwing out the things until only some corn was left, which he told witness to put out while he would go and get the oxen, and on returning with them the prisoner spoke from behind the wagon and said "hold on;" deceased said "d—n you, don't jaw me or I'll give you what you want," and left the oxen and went around the wagon towards the prisoner.

It was a dark night, but witness could see the parties, though not very distinctly, and the next thing he noticed was the deceased who called him and said he was bleeding; he jumped out of the wagon and ran towards them, when he saw deceased jerk prisoner down, and had his hand in

prisoner's hair, when he parted them. Deceased had no weapon; asked witness to stop the blood; witness went to the house, and on his return found deceased in a dying condition; met prisoner about ten steps off and asked him if deceased was dead, and he replied, "he was a dead man, get some one here as quick as you can." Witness said "you ought not to have done it," to which prisoner replied, "he ought not to have rushed on me; I did not do it, he did it himself." A pocket knife of prisoner's was found near the wagon with a broken back-spring, which he had owned for a long time. Deceased was under the influence of liquor, and witness did not hear prisoner say an angry word.

The day before the difficulty the parties had hunted together and the prisoner stayed at the house of deceased all night, and they came to Asheville together and were friendly, and witness did not hear prisoner curse or use any insulting or provoking language during the fight.

Another witness introduced by the state testified that a short time before the homicide he heard prisoner, speaking of deceased, say, "if he fools with me I'll kill him;" and another witness testified that about five years before the homicide the prisoner said to him, "if deceased did not quit bothering him he would kill him."

It was also in evidence that deceased was a large man, of powerful muscle, and was under the influence of liquor, and that prisoner was a man of ordinary strength, and greatly inferior to deceased. The prisoner introduced no testimony. That part of the charge of His Honor which is reviewed by this court is sufficiently stated by Mr. Justice ASHE in delivering the opinion. There was a verdict of guilty, judgment, appeal by prisoner.

*Attorney General*, for the state.

*Messrs. Reade, Busbee & Busbee, M. E. Carter* and *C. M. McLoud*, for the prisoner.

ASHE, J.  From the statement of the case which forms a part of the record, it does not appear to have been controverted that the homicide was committed by the prisoner, and the only question presented is, whether he was guilty of murder or a less offence.

A number of instructions were asked for by the counsel of the prisoner, some of which were correct, and others not, and some His Honor gave, and others he declined to give; but for the purpose of this appeal it is only necessary that we should notice one of the instructions given by him, and one other which he refused to give.  In his first charge to the jury, His Honor in alluding to the threats which were proved to have been made by the prisoner against the deceased, said : "the state insists there was previous malice; if so, it would be a clear case of murder;" and again, when the jury came in and asked the court to read to them a passage from Foster's Crown Law which he had read to them in his charge, he read the passage and made some explanatory remarks, when the counsel for the prisoner stated that he had not succeeded in getting His Honor in his main charge to instruct the jury as to the point made by him as to the difference between the preparation beforehand of a weapon with a view to use it in a fight, and its use without having been so prepared, and asked the court then to charge the jury that "unless the knife had been prepared for the purpose its use was not necessarily evidence of malice." His Honor replied excitedly and in a raised voice, " I'll charge no such thing." This was a proper charge and it was error to refuse it.  The refusal to give it was calculated to mislead the jury by creating the impression on their minds that His Honor held the converse of the proposition embodied in the instruction to be the law, to-wit, that though the knife was not prepared for the purpose, its use was necessarily evidence of malice.  The refusal to give this charge, taken in connection with the instruction—equally

erroneous—previously given by His Honor in his main charge, "if there was previous malice it was a clear case of murder," very probably brought the jury to the conclusion that the prisoner was guilty of murder—a conclusion, it seems to us, not warranted by the facts of the case. For after a careful perusal and consideration of all the facts and circumstances disclosed by the evidence in the case, we are unable to discover the first element of murder, unless it is to be found in the previous threats; but we think the malice that might be presumed from them is fully rebutted by the circumstances developed in the testimony offered by the state. One of the threats had been made five years before the homicide, and the other, the witness says, a short time before. What he means by a short time, whether a week, a month or a year, we are not informed. But let that be as it may, after these threats were made the state proved that a reconciliation had taken place, and that they were friendly when they came to the town of Asheville. Even if the prisoner had borne malice towards the deceased a week or a month previous, they were friendly at the time, and the quarrel being sudden and great provocation given, the law does not refer the motive to the previous malice, but to the provocation. Such is the indulgence shown to human frailty that when two persons have fought even on malice and afterwards to all appearances are reconciled, and fight again on fresh quarrel, it will not be presumed that they were moved by the old grudge, unless it appear from all the circumstances of the fact. Hawkins, P. C., ch. 31, § 30; *State* v. *Jacob Johnson*, 2 Jones, 247; *State* v. *Hill*, 4 Dev. & Bat., 491.

But in this case all the "circumstances of the fact" lead to the conclusion that the prisoner was not moved by malice; that though time and again cursed and insulted by the deceased, he never uttered the first word of anger or recrimination; nor did any act that was calculated to provoke or

excite his ire; and when deceased cursed him, saying, " d—n you, if you are going to do anything, go to work and don't stand there," if he had been harboring malice towards the deceased and cherished a purpose to gratify it, then was his opportunity, by reproach, taunt, or insult, to provoke him to some demonstration of violence when he might use the knife he had prepared for the purpose. But he did no such thing. He did not use a profane or angry word, but walked away as if to avoid a difficulty with his brother-in-law, whom he saw excited with spirits and passion. Such is not the conduct of a man moved by malice, and when he is suddenly set upon by the deceased, a man of extraordinary muscle and great physical strength, who it is reasonable to presume commenced the fight from the violent and impetuous temper he was displaying, the threat he had just made, —" d—n you, don't jaw me, or I'll give you what you want"— and the suddenness with which he left his oxen and made for the prisoner, rushing upon him, as the prisoner said—a declaration brought out by the state. The prisoner being the weaker of the two had resort to what His Honor held to be a deadly weapon, an ordinary pocket knife, with a broken back-spring which he had carried about his person for a long time. His Honor must have supposed that these facts taken in connection with the previous threats, brought this case within the rule laid down in *Madison Johnson's case,* 1 Ire., 354; but not so; " to have that effect there must be a particular and definite intent to kill, as if the weapon with which the party intends to kill is shown, or the time and place are fixed on, and the party goes to the place at the time for the purpose of meeting his adversary with an intent to kill him." If they meet as in this case upon sudden quarrel, fight, and one kills the other even when there was malice, the law will not refer the motive to the malice, but to the provocation, and extenuate the offence to manslaugh-

ter. *State* v. *Jacob Johnson,* 2 Jones, 247; *State* v. *Floyd,* 6 Jones, 392.

There is error. Let this be certified to the superior court of Buncombe, that further proceedings may be had in this case agreeably to this decision and the laws of the state.

Error.                                    *Venire de novo.*