STATE v. WILLIAM S. MILLER.

*Criminal Law—Manslaughter—Evidence—Instructions.*

1. On a trial of a defendant charged with murder it appeared that while he and others were engaged in friendly conversation the deceased, a powerful man, came up on horseback in a gallop, halloing twice and applying an insulting epithet to his horse, which defendant misinterpreted as applicable to himself; a demand for explanation by the defendant was followed by an insult from the deceased, who advanced with threatening aspect and words upon the defendant, who retreated until overtaken and knocked or pushed down by deceased, and while upon the ground, and during the struggle, inflicted nine cuts or stabs with a pocket-knife, from which deceased died : *Held,* that the repeated cutting of deceased with the knife during the fight, resulting in the death of deceased, was not murder, since there was no evidence of express malice or of a previous preparation for the fight by the defendant, or that he used the knife after deceased had been taken off his prostrate body, but such killing, being the result of passion produced by the fight, was manslaughter at the most.

2. Although, when killing with a deadly weapon is proved and admitted, the burden is shifted upon the prisoner to show mitigation or excuse, yet when it appears that, in no aspect of the testimony, and under no inference fairly deducible from it, the prisoner is guilty of murder, it is error in the Court to refuse the prayer for an instruction to the jury that they must not return a verdict for any higher offense than manslaughter.

3. Though the law may raise a presumption from a given state of facts, nothing more appearing, it is the province of the Court, when all the facts are developed and known, to tell the jury whether, in every aspect of the testimony, such presumption is rebutted.

INDICTMENT for murder, tried before *Boykin, J.,* and a jury, at Fall Term, 1892, of IREDELL Superior Court.

The defendant was convicted, and appealed.

The facts are stated in the opinion of Associate Justice AVERY.

*The Attorney General,* for the State.
*Mr. R. Z. Linney,* for defendant (appellant).

AVERY, J.: The Court was asked to instruct the jury, in substance, that in the most unfavorable aspect of the testimony for the defence the prisoner was not guilty of murder. In refusing this request we think there was error, which entitles the prisoner to a new trial.

The Attorney General contends that upon the admission that the killing was done by the prisoner with a pocket-knife, which was a deadly weapon, the State having shown *prima facie* that the prisoner was guilty of murder, and shifted the burden of proof upon him, it was not the province of the Judge, in any event, to tell the jury that they were not at liberty to find him guilty of murder, no matter what were the subsequent developments of the testimony, but that the jury should have been left with appropriate instructions, as to the law, to determine upon a consideration of the whole of the evidence whether the killing was done under such provocation as would mitigate it to manslaughter or justify or excuse it.

Collating from the testimony of the various witnesses that most prejudicial to the prisoner, and putting the whole into a connected narrative, it would present about the following state of facts: The prisoner was returning in a cart, with the witness C. J. Yount, from Sharon Church, when they overtook, at the cross-roads, the witnesses George Douglass and Will Stewart, and after the four had been engaged in

conversation three or four minutes the deceased, Jack Wilfong, came up on horseback, in a fast gallop or rack, and passed to a point about twenty-seven feet beyond the cart in which the prisoner and Yount were sitting, when he jumped off his horse. Deceased had "whooped" or yelled twice very loud as he approached them, and as he jumped from his horse he said either, "I'm a son of a bitch and I'm loose" or, according to other witnesses, "You are a son of a bitch," his horse having dodged as he came up, whereupon the prisoner, Miller, getting out of the cart and taking a position at the shaft, replied: "Don't call me a son of a bitch," or "You had better not call me a son of a bitch." Wilfong then threw off his coat and came down to the wheel of the cart. Douglass said to Miller as deceased was coming down, "He was talking to his horse." C. J. Yount, who was in the cart, said, "Jack, were you talking to your horse?" Wilfong said, "Yes." Miller again said, "You had better not call me a son of a bitch." Miller repeated this language several times. When this was said both were at the cart, Miller near the shaft and Wilfong at the wheel. Wilfong then said, "I can call you a damn liar; you made an attempt to draw a pistol on me." Miller said he had no pistol. Wilfong said, "You have got one, or a razor. I saw it shining." Miller said he did not. Wilfong said, "You are a damn liar if you say you have not." Wilfong then went towards Miller, saying, "You are a God damn liar if you say you have no pistol or razor." Wilfong advanced on the prisoner as he said this, and prisoner retreated, walking backward until the deceased overtook and knocked or pushed him down. As Miller was backing the deceased was saying, "You are a damn liar, I did not call you a son of a bitch, but I can put it on you." Miller, as he was backing, said in reply, "Jack, I am your friend," or, according to another witness for the State, "Jack,

you and I are good friends; we were in the caliboose together." Deceased said, "You are a damn liar, you have got a pistol, and I intend to whip you." The witness Stewart, who walked off as Wilfong began to advance, testified that Miller's hand was then open and that he had no knife in it then. According to the testimony of the third eye-witness of the encounter, who was examined for the State, deceased said, on first approaching the cart, "I didn't call you a son of a bitch, but I can do it. I'm not like the man that can't. You are a son of a bitch," and started towards Miller, saying, as stated by the other witnesses, "You have a pistol or a razor," and that Miller said then, "I have not, but don't crowd me. You and I have been good friends, but if you come on me you will not find me Hose Stewart or Ave Miller," and was backing when he said it.

The only one of the three witnesses present, who testified at all as to the matter, stated that as Miller backed he had his hands at his side. All the witnesses testified that deceased knocked or threw prisoner down and then the sound of licks was heard in rapid succession until the witness Stewart pulled deceased off Miller, and found that he was cut and bleeding. The deceased struck the prisoner a number of blows with both hands, and both seemed to be striking at each other while on the ground. Deceased was carried to the house of Douglass, near by. A witness then looked and saw Miller at the cart; he said he had no pistol or razor, and the witness found in his vest pocket a small knife, and in the pocket of his pants a larger one. Miller said he was not hurt badly, but was wiping his face with his handkerchief.

According to all of the witnesses deceased was a very powerful man, larger than the prisoner, and when drinking was considered violent and dangerous. Both deceased and prisoner had been drinking on that night.

It was in evidence that a physician examined prisoner afterwards, on the next day, and saw no external bruises or injury on his face. The deceased was slightly stabbed in the left cheek, and cut to the bone on the left side of the chin; his clothing cut and the skin grazed on the left shoulder; his index finger was cut as if by catching the knife and having it drawn through the hand; the fatal wound was on the right arm, the knife having been apparently drawn upward into the joint of the arm and then pulled diagonally across the arm; there were cuts in the back of the coat; there was a cut on the right sleeve; there were two little gashes on the right side of the forehead and two stabs in the nose; there were nine cuts on the body; Wilfong died from hemorrhage from the wound on the arm that night.

Doctor Yount testified that Miller said it was his knife that Wilfong saw in the moonlight when they were at the cart.

A witness, C. J. Dellinger, was telling prisoner some two weeks before the homicide of a fight that Wilfong had had with some one, and said if Jack Wilfong ever attacked him he would defend himself. Prisoner said he had nothing against Wilfong, but if he or any other big man came on him he would knife him.

Four neighbors were engaged in friendly conversation when the deceased came upon the ground in a gallop, his approach being heralded only by his hallooing twice. An insulting epithet is applied by him to his horse, and his language being evidently misinterpreted by the prisoner, the demand for explanation leads almost immediately to insult and a threatening advance, ending in an assault. If the prisoner had stood his ground or met the deceased half way and the combat had been mutual from the beginning, there would have been no evidence of premeditation on the

part of the prisoner. At most it is a case where "two men upon a sudden quarrel get into a fist fight, and one without notice draws a knife and stabs the other to the heart," and, as was said in *State* v. *Curry*, 1 Jones, 280, "It is manslaughter because, out of regard to the frailty of our human nature, the killing is supposed to be the effect of passion brought on by the high excitement of the fight." *State* v. *Massage*, 65 N. C., 480.

.The prisoner went into the fight with no weapon but his pocket-knife, with which he inflicted the fatal wound. So that there. was no evidence of such preparation as tended to show a premeditated purpose to kill. Though a number of wounds were inflicted the cutting was all done while the parties were engaged in the struggle, giving and receiving blows. If by any possibility the inference could be drawn that the .prisoner began to cut with a pocket-knife when the deceased was rushing upon the prisoner, threatening to whip him, and continued only till deceased was taken off his prostrate body, still it would be an unpremeditated combat, in which one of the parties in the heat of passion, engendered by the contest, struck the other a fatal blow with a weapon that he would be supposed to carry always for other purposes. As there was no evidence of previous preparation for the fight on the one hand, there was on the other not a scintilla of testimony tending to show a persistent use of the weapon after the mutual struggle was over, and nothing in the manner of killing inconsistent with the idea that the wounds were all inflicted under the influence of blinding passion in the dark, when there was no means of knowing how severely a powerful adversary, who still held the prisoner down, had been punished.

"Whenever force is used upon the person of another, under circumstances amounting to an indictable offense,

such force is a legal provocation." *State* v. *Cæsar*, 9 Ired., 391.  Though such provocation is given, if it be shown that the accused previously procured a weapon for the express purpose of using it, if he should get into a fight with deceased at a particular time or place or on a certain contingency, and at the appointed time or place, or on the happening of the event mentioned, did slay deceased with the weapon, the offense would ordinarily be murder. *State* v. *Hogue*, 6 Jones, 381.  And if upon engaging in a combat, where the parties are equally matched, both enter into it willingly, but one begins the fight with an unusual deadly weapon, such as a bowie-knife or pistol, and slays his adversary, the law demands some explanation of the use, in the inception of the affray, of such disproportionate force upon one who is using only his fists; but the fact that the deceased was a violent and dangerous man, and more powerful than the accused, would even in such a case repel the inference of malice.  *State* v. *Floyd*, 6 Jones, 392.  In our case the weapon was not of such a character as to warrant the inference that it was prepared for the purpose, and there was no express evidence to that effect.

Though several wounds seem to have been inflicted with the knife, indicating that many cuts or thrusts were made, yet it appears from the testimony that the knife was not used after the deceased was pulled off the prostrate body of the prisoner, and that, under the circumstances, striking as he was in the dark at an adversary who had thrown or knocked him down and was holding him to the ground, there was no such evidence of the willful use of excessive force as to warrant the inference that the killing was prompted by malice and not done in the heat of passion, aroused by the fight.  *State* v. *Ramsay*, 5 Jones, 195.  In Ramsay's case the deceased, who was drunk, persisted in catching hold of prisoner's bridle rein and stopping his

horse, when the prisoner dismounted, knocked the deceased down with a gallon jug full of molasses, and, when both arose from the ground, knocked deceased down a second time and struck him two severe blows in the face with the jug after he was prostrate and apparently senseless upon the ground, mashing his nose and breaking his skull, and saying to him then, "Damn you, lie there." Judge BATTLE, for the Court, said: "The fall was well calculated to excite his (prisoner's) passions still higher, and then to strike again and again with what he still held in his hands was the impulse of blind fury. There was no appearance of 'coolness, deliberation or reflection' in his conduct, and the exclamation which follows—"Damn you, lie there"—was the dictate and the evidence of a *furor brevis*, which had just so fatally expended itself. * * * We do not think that the provocation was slight, nor was it great. It was sufficient to arouse passion even in an ordinarily well-balanced mind, and the killing, though done with an excess of violence, was not out of all proportion to the provocation." In no phase presented by the evidence does it appear that the prisoner in our case continued to cut with his knife beyond the time when he was being assailed by a powerful man, who still held him upon the ground, and he was not required, under the circumstances, to weigh with golden scales the amount of force used on an antagonist so situated. There being neither evidence of express malice, of preparation for the encounter (from which it might have been argued), nor of deliberate cruelty and coolness in the manner of inflicting the wound, the offense was at most manslaughter.

It is true that when the killing with a deadly weapon is proved and admitted the burden is shifted upon the prisoner, and he must satisfy the jury, if he can do so from the whole of the testimony, as well that offered for the State as for the defence, that matter relied on to show mitigation or

excuse is true.    *State* v. *Vann*, 82 N. C., 631; *State* v. *Willis*, 63 N. C., 26; *State* v. *Brittain*, 89 N. C., 481.    But when it appears to the Judge that in no aspect of the testimony, and under no inference that can be fairly drawn from it, is the prisoner guilty of murder, it is his duty, certainly when requested to do so, to instruct the jury that they must not return a verdict for any higher offense than manslaughter, just as it would be his duty to instruct, in a proper case, that no sufficient evidence had been offered to either excuse or mitigate the slaying with a deadly weapon.    Though the law may raise a presumption from a given state of facts, nothing more appearing, it is nevertheless the province of the Court, when all of the facts are developed and known, to tell the jury whether in every aspect of the testimony the presumption is rebutted.    *State* v. *Roten*, 86 N. C., 701; *Doggett* v. *Railroad*, 81 N. C., 459; *Ballinger* v. *Cureton*, 104 N. C., 474.

There was testimony tending to show that the killing was justifiable on the ground of self-defence, and much of the charge was directed to the aspects of the evidence relied upon for that purpose.    It is not necessary for us to go further than to say that there was error in refusing the eighth prayer for instruction (to-wit, that from all the evidence in the case in no view of it can the prisoner be convicted of murder), and the prisoner is entitled to a

New Trial.