STATE v. S. M. POLLARD.

(Filed 21 October, 1914.)

1. Homicide—Self-defense—Willingness.

Where the evidence is conflicting, upon a trial for a homicide, as to the question of whether the prisoner was guilty of manslaughter or was justified in the killing by acting in self-defense, it is reversible error for the trial judge to charge the jury that the prisoner would be guilty of manslaughter should they find that the prisoner entered willingly into the fight with a deadly weapon, although for the purpose of defending himself, for every man who is induced to act in self-defense by reason of a threatened and deadly attack upon himself in a very genuine sense does so willingly.

2. Same — Elements of Self-defense — Unlawful Fighting—Trials—Instructions.

Where self-defense is relied upon on a trial for homicide, with evidence tending to establish it, it is for the jury to determine whether the prisoner acted with reasonable apprehension that he must kill the deceased in order to save his own life or himself from great bodily harm; and should they find that the prisoner acted with such reasonable apprehension exclusively in his own defense, judging his conduct by circumstances as they reasonably appeared to him at the time of the homicide, and that he had not provoked the fight, or was not at fault in bringing it about, they should render a verdict of acquittal.

3. Same—Killing of Officer—Evidence.

The defendant, on trial for the murder of an officer of the law, was suspected by the latter of keeping a gambling place, he having watched the place for some time, occasioning bad blood between the prisoner and himself. There was evidence tending to show that the deceased was a man of violent temper and dangerous, and had actually threatened to kill the prisoner, and that these things were known to the prisoner; that at the time of the homicide the deceased entered the prisoner's place of business, armed with two pistols, in his pockets, and was ordered out by the prisoner, and also that the deceased had remarked to others upon this occasion that he was not taking any chances that evening; that deceased refused to leave at the prisoner's command, and followed him as he

was waiting on a customer, and was again ordered to leave, whereupon the deceased again refused to leave, and cursed the prisoner, throwing his right hand to his right hip, and putting his left foot a little forward, and then the prisoner fired his pistol, when a struggle ensued for the possession of the pistol, in which the pistol was again fired, and under these circumstances the fatal wound was inflicted. *Held,* reversible error for the judge to charge the jury, among other things, that if they found that the prisoner was willing, under the circumstances, to enter into the fight, he would be guilty of manslaughter, for such a charge leaves out the question whether the deceased unlawfully entered into the fight.

CLARK, C. J., dissenting.

APPEAL by defendant from *Daniels, J.,* at April Term, 1914, of PITT.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*
*Manning & Kitchin, Harry Skinner, Jarvis & Wooten, Julius Brown, L. G. Cooper, F. G. James & Son, Moore & Long, and N. W. Outlaw for defendant.*

WALKER, J. The prisoner was indicted in the court below for the murder of T. H. Smith, and convicted of manslaughter. Sentence having been pronounced, he appealed to this Court. The deceased was chief of police at Farmville, N. C., and was shot by the prisoner at the latter's store in Farmville, on 17 January, 1914, it being Saturday night. There was evidence tending to show that there had been some ill-feeling between the two men, on account of the fact that the deceased had been watching the prisoner's place of business and had threatened to prosecute him for gambling on his premises and selling liquor, and that deceased was very angry with and had threatened to kill the prisoner. They had an altercation the Saturday night of the week before the homicide was committed. It was shown that the deceased was a man of violent temper and dangerous, to the knowledge of the prisoner. On the night of the homicide the deceased entered the prisoner's store and was ordered out, prisoner saying to him, "I have told you to keep out of my place of business, and I wish you would get out." In order to better understand the occurrences at the time of the shooting, it is well to give a brief description of the drug store. The store stands on the corner of the street, and the entrance to the store is at the corner. On the left as one enters there is a row of showcases; then in front of the door near the wall there is another row of showcases, on one of which stands the soda fountain and on the other stands the cigar case, with a space of about 2 feet between the two; then near the wall parallel to the first row of showcases is the third row of showcases. Smith entered the store at the door and walked first where some young men were punching a punch-

board near the soda fountain; one of them asked him to take a punch, and he said, "No, I am not taking any chances tonight," and then turned and walked in the direction of the third row of showcases. When Smith entered the store, defendant was standing behind his counter near the soda fountain, where the young men were punching; about this instant some customer called for a package of cigarettes, and defendant walked down behind the counter to the cigar case to wait on the customer. While defendant was standing behind the cigar case, Smith walked from the door up to within 6 or 7 feet of where defendant was standing. Defendant said to Smith, "I have told you to keep out of my place of business, and I wish you would get out." Smith replied, "I am not going anywhere, you damn son of a bitch," and then threw his right hand to his right hip, putting his left foot a little forward. This position placed Smith partly facing and partly sidewise to the defendant. When defendant saw Smith throw his right hand to his hip pocket, he fired the fatal shot, believing, as he says, that his own life was in danger. When defendant fired, Smith was near enough to him to reach out his left hand and catch hold of the pistol in defendant's hand. A struggle then ensued for the possession of the pistol, and while the struggle was going on, the second shot was fired, which went in the floor behind the counter, defendant remaining all the time behind the same. When Smith entered the store he had his hands in his pants pockets, so nearly all the witnesses say, but he had his right hand out of his breeches pocket just before the shooting took place, according to those who were looking at him at the time. This was the defendant's contention, as stated in its brief. The prisoner introduced testimony to show that he acted strictly in self-defense and for the protection of himself against a threatened assault by Smith, which would have endangered his life. Smith had two pistols, one in his right overcoat pocket and the other in his left hip pocket. As he was being taken from the store after the shooting, he fired at the prisoner with one of these pistols, but did not hit him. The prisoner contended, and offered proof to show, that just before he fired the fatal shot, Smith had placed himself in a hostile and menacing attitude, which at once inspired him with the fear or apprehension that deceased was about to attack him with one of the pistols, and for this reason he shot deceased, knowing his violent character and that he had threatened to kill the prisoner. There was evidence bearing more or less upon the question, whether the prisoner fired in self-defense or because of his animosity toward Smith, or whether he entered into the altercation willingly.

The State contended that the pistol was fired by the prisoner without any legal provocation, though the solicitor announced that he would not prosecute him for murder in the first degree, and that the prisoner was,

at least, guilty of manslaughter, as he entered into the fight willingly. This brings us to an instruction of the court which we think was erroneous and entitles the prisoner to a new trial. It is this: "If you should find from the evidence that the defendant Pollard saw the deceased Smith when he came in the store, and saw that his face was red and that he appeared to be mad, and that he, defendant, then walked from the position he occupied to the cigar case to wait upon a customer, and that the deceased saw the defendant there and approached him and came in about 6 or 7 feet from him, and the defendant told deceased to get out, and the deceased replied, 'I am not going anywhere, you damn son of a bitch,' and turned and carried his right hand to his hip pocket, and the defendant believed the deceased was about to draw his pistol for the purpose of assaulting the defendant with it, and that the defendant was willing to enter into a fight with the deceased with deadly weapons, and immediately drew his pistol and shot and killed the deceased, defendant would be guilty of manslaughter; and this would be so if the manner and appearance of deceased were such as to cause defendant to believe that Smith was armed with deadly weapons, and that he was about to harm him with them."

It will be seen, at a glance, that the learned presiding judge has blended the doctrine of self-defense and that of manslaughter in one instruction, without proper discrimination between the two, and he used an expression which was manifestly calculated, though of course not intended, to mislead the jury as to the true nature of manslaughter, and to produce confusion in their minds. Every man who is induced to act in his self-defense by reason of a threatened and deadly attack upon himself, in a sense, and a very genuine sense, is willing to enter into the fight, for every man may fairly be supposed to be willing to defend his life and limb against one who threatens either by a demonstration of force. What his Honor intended to say, we assume, was this, that if the prisoner justifiably fought upon a principle of self-defense, they should acquit, for he had said this before in his charge; but if he did not, and entered into the fight willingly, but with legal provocation, he would be guilty of manslaughter. This he did not say.

The very same kind of instruction now under consideration was given by the Court in *S. v. Baldwin,* 155 N. C., 494, and met then with our condemnation. In that case *Justice Hoke* said with reference to it: "The judge charged: 'If you should find that he fought willingly at any time up to the fatal moment, it would be your duty to convict the defendant of manslaughter, there being no evidence that he retreated or otherwise showed that he abandoned the fight; but if you should find that he entered into the combat unwillingly, then you should proceed to consider his plea of self-defense.' In *Garland's case,* 138 N. C., 675-678, the

Court said: 'It is the law of this State that where a man provokes a fight by unlawfully assaulting another, and in the progress of the fight kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the original assailant to kill in order to save his own life.' Citing Foster's Criminal Law, p. 276. But authority does not justify the position as contained in the excerpt from his Honor's charge, 'That if he fought willingly at any time up to the fatal moment, it would be your duty to convict of manslaughter.' This would be to inculpate a man who fought willingly, but rightfully, and in his necessary self-defense. True, the concluding portion of the statement would seem to qualify the position to some extent, but not sufficiently so to correct it, and in a case of this importance, and as the matter goes back for another hearing, we have considered it best to advert to the error." If he had fought willingly, and with legal provocation, which was not sufficient, though, to acquit or to reduce his assault to self-defense, he would still be guilty of manslaughter. If the homicide is not murder in the first or second degree, and yet is not excusable in law, as having been done in the slayer's self-defense, it follows that it must be manslaughter. The judge may have had in mind the doctrine as stated in *S. v. Quick,* 150 N. C., at p. 824, where it is said: "There is evidence tending to prove that the quarrel was a 'drunken brawl,' started suddenly by an altercation over some gin; that the deceased whipped out his pistol and shot at defendant about the same time, if not a little sooner, than defendant shot at him; that the parties fought willingly, suddenly, and upon equal terms. This brings the case within those precedents which hold that if two men fight upon a sudden quarrel, and one kills the other, the chances being equal, this constitutes manslaughter. *S. v. Massage,* 65 N. C., 480; *S. v. Hildreth,* 31 N. C., 429; *S. v. Brittain,* 89 N. C., 481; *S. v. Ellick,* 60 N. C., 450. Killing, the result of passion produced by fight, is manslaughter. *S. v. Miller,* 112 N. C., 878; *S. v. Crane,* 95 N. C., 619. It is further held that if a person upon whom an assault is made with violence resent it immediately by killing the aggressor, and act therein in heat of blood and not exclusively in his own defense, it is manslaughter. *S. v. Tackett,* 8 N. C., 210; *S. v. Roberts,* 8 N. C., 350; *S. v. Smith,* 77 N. C., 488; *S. v. Barnwell,* 80 N. C., 466." But that does not justify the charge given in this case. In order to be guilty at all, he must have fought willingly, but wrongfully. If he fought willingly, but rightfully, that is, exclusively in his own defense, no excessive force being employed, he should be acquitted. But he is entitled to have the jury judge his conduct by circumstances as they reasonably appeared to him at the time of the homicide. It is the reasonable apprehension of danger by him, to be found by the jury, that excuses his act, and he may act upon appearances.

We recently stated the principle in *S. v. Blackwell,* 162 N. C., at p. 683, citing *S. v. Barrett,* 132 N. C., 1005, as follows: "The reasonableness of his apprehension must always be for the jury, and not the defendant, to pass upon; but the jury must form their conclusion from the facts and circumstances as they appeared to the defendant at the time he committed the alleged criminal act. If his adversary does anything which is calculated to excite in the prisoner's mind, while in the exercise of ordinary firmness, a reasonable apprehension that he is about to assail the prisoner and take his life, or to inflict great bodily harm, it would seem that the law should permit the latter to act in obedience to the natural impulse of self-preservation and to defend himself against what he supposes to be a threatened attack, even though it may turn out afterwards that he was misled; provided, always, as we have said, the jury find that his apprehension was a reasonable one and that he acted with ordinary firmness. The prisoner must not only have thought that he was in danger of his life or of receiving great bodily harm, but his apprehension must be based on reasonable grounds, to be determined by the jury in the manner we have stated, and not by the prisoner." Also citing *S. v. Cox,* 153 N. C., 638; *S. v. Kimbrell,* 151 N. C., 702; *S. v. Dixon,* 75 N. C., 275, and *S. v. Nash,* 88 N. C., 621. It was also well stated by *Justice Allen* very recently in *S. v. Johnson,* 166 N. C., 392, thus: "These authorities and many others to the same effect could be cited establishing the following propositions: (1) That one may kill in self-defense to prevent death or great bodily harm. (2) That he may kill when not necessary if he believes it to be so and has a reasonable ground for the belief. (3) That the reasonableness of the belief must be judged by the facts and circumstances as they appear to the party charged at the time of the killing," and in *S. v. Gray,* 162 N. C., 613, by the same justice: "One may kill when necessary in self-defense of himself, his family, or his home, and he has the same right when not actually necessary if he believes it to be so, and has a reasonable ground for the belief." See *S. v. Vann,* 162 N. C., 535; *S. v. Robertson,* 166 N. C., 356; *S. v. Ray, ibid.,* 420. This benignant principle of the law was denied to the prisoner by the instruction of the court which we have quoted, because, however willingly a man may fight, if he is in the right and keeps within the legitimate bounds of self-defense, the law will protect him. It is only when, under the guise of self-defense, he is acting from some ulterior motive of vengeance or malice, and not strictly in defense of his person, that he will be condemned. The very question was presented in *S. v. Garland,* 138 N. C., 678, where *Justice Hoke* said: "Where a man provokes a fight by *unlawfully* assaulting another and in the progress of the fight kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the

original assailant to kill in order to save his own life. This is ordinarily true where a man *unlawfully* and willingly enters into a mutual combat with another and kills his adversary. In either case, in order to excuse the killing on the plea of self-defense, it is necessary for the accused to show that he 'quitted the combat before the mortal wound was given, and retreated or fled as far as he could with safety, and then, urged by mere necessity, killed his adversary for the preservation of his own life.' Foster's Crown Law, p. 276." It will be observed that the learned judge there states that the prisoner must unlawfully and willfully enter a mutual combat with his adversary, and this explains what is said in *S. v. Exum,* 138 N. C., at pp. 618 and 619, citing *S. v. Kennedy,* 91 N. C., 572, and *S. v. Brittain,* 89 N. C., 481. But in this case there was ample evidence tending to show that the prisoner did not commit any unlawful act, although he may willingly have stood his ground and defended himself against what he had reason to believe was a murderous assault upon him.

The jury may have found from the evidence that the prisoner had been informed of the deadly threat made against him by the deceased; that he had also heard of his violent temper and dangerous tendencies; and if some of the evidence be true—and the jury must pass upon its credibility—that, by his threatening attitude toward the prisoner when he approached him in the store, he had determined to execute his threats, then and there, and that such was the impression reasonably made upon the prisoner by his conduct. If such were the case, as has been formerly and justly said by this Court, the prisoner could not be expected to confront a lion with the same composure as he would a lamb, a pronounced enemy and belligerent as he would a friend or a man of peaceful intentions. He must not only be willing to defend himself against attack, but he must also be in the wrong to deprive him of the favorable consideration of the law.

If the instruction of the court be correct, it would be difficult if not impossible to make out a case of self-defense, because every man who is in the right, when defending his person against a threatened and deadly assault, would be convicted of manslaughter if the jury should find that he acted willingly in protecting himself against the attack. We would then have the converse of the dictum of Foster and Hale, for instead of every homicide being turned into self-defense, every case of genuine self-defense would be turned into murder or manslaughter. It is possible for an assailant to be in the right, if he has not himself created the necessity for the assault or brought the trouble upon himself by some unlawful act. In this instance the jury may have found that the situation demanded prompt action by the prisoner in order to save himself from a menaced attack of a man, known by him to be his enemy and who had

actually declared vengeance against him, who was doubly armed for any eventuality, and who had said, almost at the fatal moment, that he would "take no chances" that evening. All these questions were for the jury upon the evidence. They may have rejected this testimony and have found, on the contrary, that the prisoner did not assault the deceased, honestly and with good faith, in his self-defense, but unlawfully and with a bad motive, convicting him of murder or manslaughter, as upon the evidence they might find the facts to be; but the prisoner was entitled to a legally proper consideration of the testimony for and against him, and was handicapped by an erroneous view of the law by which his willingness to defend himself was made the test of his criminality.

In a very true sense every man acts willingly when defending himself, that is, he exercises his volition naturally and irresistibly in favor of his own life, although, in another sense, he may be compelled to act in order to save his life, or to prevent grievous bodily harm to himself. He may be said not to act by choice, and still, being fiercely assaulted, he may be willing, by natural impulse, to resist it, even to the taking of his assailant's life. It is otherwise if he engages in a fight willingly, and not merely in self-defense, for this is also unlawful, being an affray. He begins in the wrong and ends, therefore, in the toils of the law. Being then in fault, the principle as stated by Foster and Hale applies: "He, therefore, who in case of a mutual conflict would excuse himself on the plea of self-defense must show that before the mortal stroke was given he had declined any further combat and retreated as far as he could with safety, and also that he killed his adversary through mere necessity and to avoid immediate death. If he faileth in either of these circumstances he will incur the penalty of manslaughter." Foster's Crown Law, pp. 276, 277; *S. v. Garland,* 138 N. C., 675. *Justice Ashe,* quoting from Hale, stated the rule strongly and clearly in *S. v. Brittain,* 89 N. C., at p. 500, as follows: "If A assaults B first, and upon that assault B reassaults A, and that so fiercely that A cannot retreat to the wall or other *non ultra,* without danger of his life, and then kills B, this shall not be interpreted to be *se defendendo,* but to be murder or simple homicide, according to the circumstances of the case; for otherwise we should have all the cases of murder or manslaughter, by way of interpretation, turned into *se defendendo.* The party assaulted indeed shall, by the favorable interpretation of the law, have the advantage of this necessity to be interpreted as a flight, to give him the advantage of *se defendendo,* when the necessity put upon him by the assailant makes his flight impossible; but he that first assaulted hath done the first wrong, and brought upon himself this necessity, and shall not have advantage of his own wrong to gain the favorable interpretation of the law, that the necessity

which he brought on himself should, by the way of interpretation, be accounted a flight to save himself from the guilt of murder or manslaughter." But these are cases where the prisoner was, at first, in the wrong, or by his own conduct provoked the difficulty. His act was wrongful and unlawful in the beginning and committed willingly, and he will be adjudged guilty of murder or manslaughter, according as the jury may find the facts to be, unless he has, in good faith, abandoned the conflict and retreated to the wall, in which case his plea of self-defense may be restored to him. It was said in *S. v. Baldwin,* 152 N. C., 822: "Our decisions are also to the effect that though there may have been previous ill-feeling between the parties, yet if they afterwards meet accidentally and a fight ensues, in which one of them is killed, it shall not be intended that they were moved by the old grudge, 'unless it so appear from the circumstances of the affair.' This was directly held in the case of *S. v. Hill,* 20 N. C., 491, where there had previously been a fight between the parties, the ruling being expressed as follows: 'Where two persons have formerly fought on malice and are apparently reconciled, and fight again on a fresh quarrel, it shall not be intended,' etc. The principle was affirmed and again applied in *S. v. Jacob Johnson,* 47 N. C., 247, and in the opinion this case is put by way of illustration: 'But where A bears malice against B, and they meet by accident, and upon a quarrel B assaults A with a grubbing-hoe, and thereupon A shoots B with a pistol, the rule of referring the motive to the previous malice will not apply.' And this is in accord with the doctrine generally prevailing." But it is added that this does not conflict with the rule, as stated in many cases, notably in *S. v. Miller,* 112 N. C., 885, by *Justice Avery,* who there said: "It is true that when the killing with a deadly weapon is proved and admitted, the burden is shifted upon the prisoner, and he must satisfy the jury, if he can do so from the whole of the testimony, as well that offered for the State as for the defendant, that matter relied on to show mitigation or excuse is true. *S. v. Vann,* 82 N. C., 631; *S. v. Willis,* 63 N. C., 26; *S. v. Brittain,* 89 N. C., 481. But when it appears to the judge that in no aspect of the testimony, and under no inference that can be fairly drawn from it, is the prisoner guilty of murder, it is his duty, certainly when requested to do so, to instruct the jury that they must not return a verdict of any higher offense than manslaughter, just as it would be his duty to instruct, in a proper case, that no sufficient evidence had been offered to either excuse or mitigate the slaying with a deadly weapon. Though the law may raise a presumption from a given state of facts, nothing more appearing, it is nevertheless the province of the court, when all the facts are developed and known, to tell the jury whether, in every aspect of the testimony, the presumption is rebutted. *S. v. Roten,* 86 N. C., 701; *Doggett v. R. R.,* 81 N. C., 459; *Ballinger v. Cureton,* 104 N. C., 474."

In the further development of this case it may be that the principles above stated may have close application to the facts as disclosed by the testimony. They are now mentioned as showing that the law is more lenient than would be indicated by the instruction of the court to which exception was taken.

It is just as unlawful to kill a man who gambles or illegally sells liquor as it is one who is innocent of these offenses, and even if the prisoner harbored malice towards the deceased because of his real or imagined persecutions as a public officer, he yet had the right to defend himself against a dangerous assault by him. This Court said in *S. v. Tachanatah*, 64 N. C., 614: "The question whether, where an antecedent grudge exists, and the parties between whom it exists meet and an affray ensues, and one is killed, the killing shall necessarily, or by a presumption of law, be referred to the antecedent grudge, so as to make the killing murder, or whether the existence of malice in giving the mortal blow shall be matter of inference for the court or jury, from all the circumstances of which the antecedent grudge is one, was considered with great care and ability in *Jacob Johnson's case,* 2 Jon., 274, and we think the rule there announced cannot be shaken. The latter view was there asserted. We think the instructions of his Honor differ widely from that view, and they seem to be founded on what is said in that case to be a mistaken view of *Madison Johnson's case,* 1 Ire., 354. His Honor refused the instruction asked for, that if the appellant fought only in self-defense and to save his own life, the homicide was not malicious, although a previous ill-will were shown, and told the jury that if there was malice (by which we understand malice implied in law from the antecedent quarrel), the appellant was guilty of murder. In this we think there was error. It is true, the jury convicted the appellant only of manslaughter, but the instructions were erroneous, and we cannot see that they did not operate prejudicially to the appellant." This was approved in *S. v. Brittain,* with the comment that "this Court held the instructions to be erroneous because they could not see that they did not operate prejudicially to the appellant." The question at last is, Did the prisoner kill in defense of himself, because he reasonably believed that he was about to suffer death or great bodily harm? If he did, an acquittal should follow, although he did so willingly, for in such a case he has committed no unlawful act. If the prisoner fired his pistol and killed deceased with malice and not in self-defense, he is guilty of murder in the second degree, unless he did it deliberately and with premeditation, when it would be murder in the first degree, for which the State does not contend; if he did so without malice and upon insufficient legal provocation and in the sudden heat of blood, it is manslaughter; and the same result would follow in law, if he used excessive force; but if he

STATE *v.* POLLARD.

killed either because it was necessary to do so or because he had good ground to believe it necessary in his defense, acting upon the circumstances as they reasonably appeared to him at the time, and with ordinary firmness, he is not guilty, and the jury should be instructed so to find. He was not bound to wait for his adversary to execute his threat or to put himself in condition to do so, provided he had reason to believe that his intention was to slay him with his pistol, or to do him great bodily harm. The jury must pass upon the reasonableness of his belief, giving him the benefit of the rule we have already stated, that they must judge his case by the circumstances as they appeared to him when he fired his pistol and inflicted the mortal wound, and not by the real situation as it may be found to have been. *S. v. Nash, supra; S. v. Barrett, supra,* and the other cases cited on this point.

The evidence in the case is voluminous. Some of it is incompetent, but as it may not be offered again, we need not consider it. There is other evidence which is competent, when confined to its proper limits, but so calculated to prejudice the prisoner by an improper use of it by the jury that they should be carefully instructed as to its legitimate bearing on the case and strictly cautioned not to be influenced by it, except in so far as it is relevant to the issue. The prisoner is entitled to this treatment of the evidence to prevent any wrong and prejudicial consideration of it.

The judgment will be set aside and a new trial awarded, because of the error indicated in this opinion.

New trial.

CLARK, C. J., dissenting: The deceased was chief of police of Farmville, and was shot and killed by the prisoner on the night of 17 January, 1914, in the store of the prisoner. The testimony of the witnesses for the State is that a few minutes before he was shot the deceased entered the prisoner's store and walked down towards the middle. The prisoner kept his eyes on him and, when he was within 5 or 6 feet, ordered the deceased to get out, and shot him. Several witnesses testified that the prisoner ordered the deceased to get out and shot at the same time. Others said it was almost immediately after. There was evidence that the two men had had a quarrel in a barber shop, and that several times during the week the prisoner had made statements which amounted to threats against deceased. There was also evidence tending to show motive, that the prisoner kept a blind tiger and a gambling room, and the prisoner had said that if the deceased came there "searching or rambling over his business" he would ask him out, intimating violence if he did not go. There was also evidence that the prisoner during the same week and just before the homicide had bought a pistol.

The deceased, under the solemnity of approaching death, made dying declarations in which he stated that the prisoner ordered him out and shot him instantly, without giving him any opportunity to defend himself or giving him any chance. Immediately after the shooting the two men grappled, and there is evidence that the only pistol in sight was the one the prisoner had used. As the deceased was being taken out of the store, after being shot, he pulled out one of his pistols, which he was entitled to carry as chief of police, and attempted to shoot the prisoner.

Taking the evidence of the prisoner himself (who testified under the most powerful inducement of saving his own life), he told the deceased to get out, and the deceased replying with an insulting· expression, carried his hand to his pocket, and thereupon the prisoner shot him.

It is needless to go into the long-drawn-out evidence and the 129 exceptions that are made. The above is the kernel of the whole case. From the record it appears that the prisoner was defended by eleven able counsel, among them several of State-wide reputation. The trial was presided over by one of the ablest and most impartial judges in this State; the prisoner had the benefit of twelve peremptory challenges against only four allowed to the State, and was convicted by twelve jurors, each of whom answered that he was satisfied beyond a reasonable doubt of the prisoner's guilt. With these overwhelming advantages in favor of the prisoner, the jury found him guilty of manslaughter. It should require more than a mere technical error to cause us to grant a new trial. The sentence of the court to five years in the State's Prison is not a severe one in view of the evidence.

The point principally relied upon by the defense is the charge of the court that if "the defendant believed the deceased was about to draw his pistol for the purpose of assaulting the defendant with it, and the defendant was willing to enter into a fight with the deceased with a deadly weapon, and immediately drew his pistol . and shot and killed the deceased, the defendant would be guilty of manslaughter." It is insisted that the judge should have said, "If the prisoner entered into the fight *unlawfully* and willingly." But this element appears when the jury was required to find that the prisoner was willing to enter into a fight, *with a deadly weapon,* and *immediately* drew his pistol. This amply supplies the word "unlawfully," for it is not controverted that the prisoner shot before the deceased had drawn any weapon.

If the dying declarations of the deceased and the testimony of the State's witnesses are to be believed, the prisoner ordered the deceased out of his store and immediately shot him, without any provocation; and there is evidence which, if believed, tends to show that this was done for fear that the officer would expose him as a lawbreaker. If the prisoner's own evidence is to be believed, rejecting that for the State,

the prisoner ordered the deceased out of his store, and upon the deceased replying with an insult and moving his hand towards his pocket the prisoner shot at him. If the jury had believed the first state of facts, the prisoner should have been convicted of murder. If they believed the last, they would have acquitted him. There remained the third theory, that the prisoner ordered the deceased out of his store, as he said, and upon receiving an insulting reply, reached for his pistol, for it was not contradicted that he alone had his pistol out when he fired, and the judge properly told the jury in this connection that if the prisoner fought willingly with a deadly weapon he was guilty of manslaughter. By fighting "willingly" the judge evidently meant if he used his pistol without necessity, for he charged correctly upon the phase of self-defense. If, when the prisoner ordered the deceased out and the deceased replied (if he did) with an insulting expression, the prisoner had struck with his fist, the resulting fight would have been an affray. So if instead of his fist the prisoner used a pistol, and the deceased had done the same, the death of either would have been manslaughter. Certainly it is none the less so when the prisoner alone used this weapon.

In *S. v. Exum,* 138 N. C., 618, *Hoke, J.,* speaking for a unanimous Court, approved the following charge: "If you should find from the evidence that the prisoner willingly engaged in a fight with the deceased, and that the deceased threw his hand to his hip pocket and advanced upon the prisoner in a threatening manner, and that the prisoner, being willing to fight, seized a pistol and shot the deceased, and that the deceased died from the wound (then inflicted by the prisoner), the prisoner would be guilty of manslaughter, provided that you should find from the evidence that the appearance and manner of the deceased was such as to cause the prisoner to believe that the deceased was armed with a deadly weapon and that the prisoner did believe that he was armed with a deadly weapon and was about to harm him with it," this Court adding: "This charge is supported by abundant authority. *S. v. Kennedy,* 91 N. C., 572; *S. v. Brittain,* 89 N. C., 481." This case has been cited frequently since as authority. See citations in the Anno. Ed. It will be seen at once that if this charge was warranted in the *Exum case* and was supported by "abundant authority," as the Court said, and as has been repeatedly approved since, certainly the case is very much stronger against the prisoner here on the evidence of this case, even taking his own statement, and there was no error in the charge of Judge Daniels.

The advantages in favor of a prisoner on trial for homicide are so overwhelming that a new trial should not be granted in such cases (nor indeed in any case, civil or criminal) unless it can be plainly seen that if there was error it was such error as reasonably caused the result.

STATE *v.* POLLARD.

This trial has been long drawn out and the prisoner's interests were amply guarded at every point. He has no cause to complain of the verdict or of the punishment.

Under the common-law procedure, before it was amended by statute, the prisoner would not have been allowed the benefit of counsel, nor of summoning witnesses, nor of cross-examining the State's witnesses. The humanity of the judges in such cases properly allowed the prisoner the benefit of every possible error or technicality. But since the law itself has humanely removed these grievances and put the prisoner not only on a level with the State in these respects, but still gives him enormous advantages—not only requiring a unanimous verdict in which each and every juror must find him guilty beyond a reasonable doubt, but of a great disparity in the number of challenges to the jury, and that errors committed against the State cannot be reviewed on appeal—errors which cannot be seen to have reasonably influenced the result ought not longer to be taken as ground for a new trial. Indeed, the better thought of the age is that unless the verdict is clearly contrary to justice no verdict in any case should be reversed on appeal.

I feel that it is useless to discuss the case more fully. A perusal of the entire testimony would probably satisfy any disinterested person that whatever errors had been assigned or discussed, justice would not suffer, and the public interests for the preservation of human life would be served by the refusal to grant a new trial in this case.

The object of a trial of one who has committed homicide is not vengeance, but the protection of the lives of others by the punishment of those who do murder. That this end is not attained can be seen from the very large number of homicides annually committed in this State, as reported by the Attorney-General under the statute, and the very rare cases of conviction. There must be a defect in the administration of justice when this is the case.

On a thorough perusal of the entire evidence, I think the ends of justice require that a new trial should not be granted. In a long trial of this kind, with numerous able counsel, if the result on appeal is to depend upon the judge running the gauntlet of every conceivable exception, as in this case, it is the judge and not the prisoner who is on trial. It is almost impossible under such circumstances that some technical flaw may not be found. It must be remembered that if the judge commits an error in favor of the prisoner it cannot be reviewed.